16 F.3d 1133
 1994 A.M.C. 2948
 MARINE TRANSPORTATION SERVICES SEA-BARGE GROUP, INC.,
Plaintiff-Counterclaim Defendant Appellant-Cross-Appellee,
v.
PYTHON HIGH PERFORMANCE MARINE CORP., in Personam,
Defendant-Counterclaim Plaintiff Appellee-Cross-Appellant,
Top Performance Marine Group, Defendant.
MARINE TRANSPORTATION SERVICES SEA-BARGE GROUP, INC.,
Plaintiff-Counterclaim Defendant-Appellant-Cross-Appellee,
v.
PYTHON HIGH PERFORMANCE MARINE CORP., in Personam,
Defendant-Counterclaim Plaintiff-Appellee-Cross-Appellant,
Top Performance Marine Group, Defendant-Appellee.
 Nos. 92-4495, 92-4573.
 United States Court of Appeals,
Eleventh Circuit.
 March 21, 1994.
 
 Timothy J. Armstrong, Armstrong & Mejer, P.A., Coral Gables, FL, for Marine Transp. Services Sea-Barge Group, Inc.
 Fernando S. Aran, Aran, Correa & Guasch, P.A., Coral Gables, FL, for Python High Performance Marine Corp.
 Appeals from the United States District Court for the Southern District of Florida.
 Before COX and BIRCH, Circuit Judges, and SMITH*, Senior Circuit Judge.
 COX, Circuit Judge:
 
 
 1
 Marine Transportation Services Sea-Barge Group, Inc. ("Sea-Barge") is a Delaware corporation principally involved in transporting cargo between ports in Florida and Puerto Rico. Python High Performance Marine Corporation ("Python") is a Florida corporation that at one time was involved in the manufacture and sale of boats. Each appeals the district court's final judgment granting various forms of relief to both parties.
 
 FACTS AND PROCEDURAL HISTORY
 
 2
 In September 1990, Julio DeVarona ("DeVarona"), an agent of Python, booked certain cargo for shipment from Miami to San Juan, Puerto Rico with Sea-Barge. The cargo consisted of one twenty-foot sealed container of boat parts ("the container") and three boat molds.[1] Python shipped the container and the boat molds separately and under separate bills of lading. Sea-Barge issued a bill of lading for the container on September 28, 1990, the same day the vessel carrying it departed for San Juan. The bill named Python as the shipper/exporter and identified "Top Performance" as the consignee that would receive the shipment in San Juan. The freight charge for carriage of the container was $1658.38. Top Performance was to pay the freight and related charges, as the bill was marked "FREIGHT COLLECT; OBLIGOR-CONSIGNEE." Top Performance and Python allegedly planned to enter into a lease under which Top Performance would pay Python $2000.00 for each boat manufactured from the boat molds and equipment Python was shipping.
 
 
 3
 On October 2, 1990, DeVarona, on behalf of Python, booked the three boat molds for shipment; the booking document specified "BOAT MOLDS--ONE HULL, TWO DECKS." Python requested Sea-Barge provide cargo insurance on the boat molds. The hull mold and one of the deck molds were bound together for shipment ("two-mold set"), while the second deck mold ("Elegante mold") remained separate.
 
 
 4
 Sometime between October 2, 1990 and October 5, 1990, the Elegante mold disappeared, never to be found again. Pictures taken by Sea-Barge on October 5, 1990, in preparation for shipment, reveal only the two-mold set; none of the pictures or documentary drawings made at the time record the presence of the Elegante mold.
 
 
 5
 The vessel carrying the two-mold set departed for San Juan on October 12, 1990. Despite the absence of the Elegante mold, the bill of lading issued for the shipment bears the entries "3" under the heading "NO. OF PKGS." and "BRBK BOATS MOLDS"[2] under the heading "DESCRIPTION OF PACKAGES AND GOODS." The bill of lading also disclosed a request and charge for insurance. Sea-Barge assessed total freight and related charges at $3155.70, also to be paid by Top Performance, as the bill was marked "FREIGHT COLLECT; OBLIGOR-CONSIGNEE."
 
 
 6
 When the shipments reached San Juan, Top Performance refused to accept the cargo. The district court determined that this refusal was due to the absence of the Elegante deck mold.[3] Upon learning of the missing deck mold from a Top Performance agent, DeVarona contacted Felipe Inostroza ("Inostroza"), Sea-Barge's traffic manager. Inostroza instructed DeVarona to file a claim for the lost deck mold along with two replacement estimates. Inostroza also offered to return the cargo to Miami at no charge and agreed that the freight for the Miami to San Juan trip would be deducted from the proceeds of the claim payment for the lost deck mold.[4]
 
 
 7
 Sea-Barge's vessel carrying the two-mold set and container departed for Miami from San Juan on April 12, 1991. Sea-Barge issued a bill of lading for the container and a separate bill for the two-mold set. Under the charges section on each bill appears the notation "TOTAL THRU FREIGHT; TOTAL CHARGES," with no dollar amount entered. (Def. Exh. 1-2 and 1-3). At trial, Sea-Barge submitted "corrected" copies of these same bills of lading showing typewritten entries for freight charges.
 
 
 8
 Upon receipt of arrival notices for the container and two-mold set, DeVarona attempted to reclaim the cargo. Relying on the accommodation Inostroza had made, DeVarona went to Sea-Barge's terminal believing he could pick up the cargo without having to pay any freight charges. Inostroza told DeVarona that he would have to pay the freight charges on the two-mold set for the Miami to San Juan trip before Sea-Barge could release the cargo. Inostroza also referred DeVarona to Dolores Trapani ("Trapani"), Sea-Barge's claims manager, for resolution of Python's account. DeVarona contacted Trapani and she demanded payment in the amount of $3155.70 prior to release of the cargo.[5]
 
 
 9
 In compliance with Trapani's demand for freight charges, DeVarona returned to Sea-Barge's terminal on or about April 30, 1991, with a Python corporate check in the amount of $3155.70. Inostroza again refused to release Python's cargo and declined to accept the check. This time, Inostroza told DeVarona simply that he could not release Python's cargo and to wait to hear from Sea-Barge's attorney. At trial, Trapani testified that only cash or a cashier's check were acceptable forms of payment and that this was the reason Python's check was not accepted. The district court found that this requirement had not been communicated to DeVarona. At the time of trial the container and two-mold set remained in Sea-Barge's possession. The molds had deteriorated beyond repair due to their exposure to the elements.
 
 
 10
 Sea-Barge brought this action against Python and Top Performance to recover freight due for the carriage of the container and the boat molds from Miami to San Juan and for the return trip to Miami. Sea-Barge also sought to collect demurrage on the cargo while it remained in Sea-Barge's possession in San Juan and Miami. Subject matter jurisdiction was grounded on admiralty jurisdiction pursuant to 28 U.S.C. Sec. 1333 (1988).
 
 
 11
 Python filed an answer and counterclaim. Python's counterclaim sought damages from Sea-Barge for the loss of the Elegante boat mold. Python also counterclaimed for conversion of the container and two-mold set due to Sea-Barge's refusals to release Python's cargo.
 
 
 12
 After a non-jury trial, the district court ruled that Sea-Barge was entitled to recover the freight charges and resulting interest. The court denied Sea-Barge's claim for demurrage. A provision in the bill of lading provided that no demurrage was applicable for delay caused by Sea-Barge. The court ruled that the delay had been Sea-Barge's fault and thus no demurrage was due.
 
 
 13
 On Python's counterclaim, the district court ruled that Sea-Barge was liable to Python for $40,000.00 (the value of the missing Elegante deck mold) plus the resulting interest. Sea-Barge's bill of lading included a $500.00 per package limit of liability for any lost, damaged, or misdelivered cargo unless the shipper declared a higher value on the cargo and paid an additional freight charge. The court ruled that Python had satisfied these two requirements by, (1) declaring a $100,000.00 value on the boat molds and (2) incurring a $50.00 insurance charge[6] that the court apparently deemed the equivalent of additional freight.
 
 
 14
 The district court also concluded that Sea-Barge had converted the container of boat parts and the two-mold set by refusing to release the cargo after Python presented a corporate check as payment for the freight. The court awarded damages of $86,500.00 plus the resulting interest based on the value of the boat parts and two-mold set. Finally, the district court denied Python's claim for lost profits because the lease between Python and Top Performance for the manufacture of boats had not been consummated.ISSUES ON APPEAL AND CONTENTIONS OF THE PARTIES
 
 
 15
 On appeal, Sea-Barge contends that the district court lacked admiralty jurisdiction and substantive grounds to: (1) apply the doctrine of equitable estoppel to estop Sea-Barge from seeking demurrage and (2) grant relief on the claim that Sea-Barge converted the two-mold set and boat parts. Alternatively, Sea-Barge argues that the district court erred in failing to apply the doctrine of avoidable consequences against Python. Sea-Barge also contends that the district court erred in refusing to award demurrage charges and in not limiting Sea-Barge's liability for the lost Elegante mold to $500.00. On cross-appeal, Python contends that the district court erred in denying its claim for lost profits. Finally, we note that neither party questions the district court's ruling concerning Python's liability for freight charges for the cargo's initial shipment from Miami to San Juan.
 
 STANDARD OF REVIEW
 
 16
 We review factual findings entered by a district court, sitting without a jury in admiralty, under the clearly erroneous standard. See Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). We review a district court's conclusions of law de novo. Insurance Co. of N. Am. v. M/V Ocean Lynx, 901 F.2d 934, 939 (11th Cir.1990), cert. denied, 498 U.S. 1025, 111 S.Ct. 675, 112 L.Ed.2d 667 (1991).
 
 DISCUSSION
 
 17
 I. District Court's Equitable Estoppel and Conversion
 
 Rulings
 
 18
 Sea-Barge argues that the district court lacked the necessary jurisdiction and substantive grounds for its rulings concerning equitable estoppel and conversion. Alternatively, Sea-Barge argues that the district court erred in failing to apply the doctrine of avoidable consequences. We find that the district court had the necessary jurisdiction and grounds for both rulings. Additionally, we find no error in the district court's refusal to apply the doctrine of avoidable consequences.
 
 A. Equitable Estoppel
 
 19
 The district court concluded that Sea-Barge was equitably estopped from enforcing its bill of lading provision that required freight charges be paid in United States currency. The court found that because Sea-Barge "made the payment of $3155.70 the only condition for release" of Python's cargo and "made no mention of the required method of payment," Sea-Barge was estopped from relying on an unmentioned bill of lading provision as grounds for refusing release of Python's cargo.[7] (R. 1-41 at 15, 16)
 
 
 20
 Whether the district court was correct in applying equitable estoppel in this case is reviewed de novo. United States v. Walcott, 972 F.2d 323, 325 (11th Cir.1992). " '[T]he constituent elements of equitable estoppel constitute questions of fact,' however," and are reviewed under the clearly erroneous standard. Id. at 325 (quoting Keefe v. Bahama Cruise Line, Inc., 867 F.2d 1318, 1323 (11th Cir.1989)).
 
 
 21
 Equitable estoppel "is grounded on a notion of fair dealing and good conscience. It is designed to aid the law in the administration of justice where without its aid injustice might result." DeShong v. Seaboard Coast Line R.R., 737 F.2d 1520, 1522 (11th Cir.1984). The doctrine operates
 
 
 22
 to preclude a party [who has made representations of fact through his words or conduct] '[f]rom asserting rights which might perhaps have otherwise existed ... as against another person, who in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquired some corresponding right....'
 
 
 23
 Oxford Shipping Co. v. New Hampshire Trading Corp., 697 F.2d 1, 4 (1st Cir.1982) (alterations in original) (quoting Precious Metals Assocs., Inc. v. Commodity Futures Trading Comm'n, 620 F.2d 900, 908 (1st Cir.1980)). Thus, the doctrine requires (1) a representation of fact by one party contrary to a later asserted position; (2) good faith reliance by another party upon the representation; and (3) a detrimental change in position by the later party due to the reliance.[8] See Irvine v. Cargill Investor Servs., Inc., 799 F.2d 1461, 1463 (11th Cir.1986) (applying Florida law and citing Department of Revenue v. Anderson, 403 So.2d 397, 400 (Fla.1981)); Department of Labor & Employment Sec. v. Little, 588 So.2d 281, 283 (Fla. 1st DCA 1991) (citing Anderson, 403 So.2d at 400).
 
 
 24
 Though our legal analysis may be slightly different than the district court's, we conclude that the court's factual findings support the application of equitable estoppel in this case.[9] First, upon DeVarona's return to Sea-Barge's terminal the second time, Inostroza implicitly represented that there was nothing DeVarona could do to retrieve Python's cargo by telling DeVarona to await communication from Sea-Barge's attorney on the status of the cargo.[10] Thus, a representation was made by Sea-Barge's agent of a material fact that was contrary to a position Sea-Barge later asserted when at trial Sea-Barge insisted DeVarona could have retrieved Python's cargo had he only tendered cash or a cashier's check.
 
 
 25
 Secondly, Python relied on this representation. Due to Inostroza's comments, Python assumed no action on its part could effect the release of the cargo.
 
 
 26
 Finally, Python's position has been detrimentally changed due to Inostroza's representation. Originally, Sea-Barge demanded only $3155.70 for the release of the cargo. No demurrage had accrued on the cargo in Miami. Now, however, demurrage has accrued, the two-deck mold set has deteriorated beyond repair, and Python has been put to defending a costly lawsuit.
 
 B. Conversion
 
 27
 Sea-Barge argues that the district court did not have subject matter jurisdiction over Python's land-based claim of conversion. This argument is without merit. Python's counterclaim for conversion arose directly from the same transaction or occurrence upon which Sea-Barge's complaint is founded. As such it was a compulsory counterclaim. Fed.R.Civ.P. 13(a). Therefore the district court had ancillary jurisdiction in admiralty to hear the counterclaim. See Eagerton v. Valuations, Inc., 698 F.2d 1115, 1119 n. 8 (11th Cir.1983); see also Thomas Schoenbaum, Admiralty and Maritime Law Sec. 20-8, at 645 (1987); 6 Charles A. Wright et al., Federal Practice and Procedure Secs. 1409-1410 (1990). Because no independent basis for federal jurisdiction is required for ancillary jurisdiction, 6 Wright et al. supra, Sec. 1409, at 49, the district court could properly entertain Python's state law conversion claim.
 
 
 28
 It follows from our determination of the unenforceability of the provision demanding payment in U.S. currency that Python made a valid tender when it presented its corporate check to Sea-Barge's agent for release of its cargo. When Sea-Barge refused acceptance of the check, it wrongfully deprived Python of its property.
 
 
 29
 In Florida, the tort of " '[c]onversion is an unauthorized act which deprives another of his property permanently or for an indefinite time.' " National Union Fire Ins. Co. v. Carib Aviation, Inc., 759 F.2d 873, 878 (11th Cir.1985) (quoting Senfeld v. Bank of Nova Scotia Trust Co. (Cayman), 450 So.2d 1157, 1160-61 (Fla. 3d DCA 1984) (footnote omitted)). "The essence of the tort is not the acquisition of the property; rather, it is the wrongful deprivation." Id. at 878. Thus, Sea-Barge converted the two-mold set and container[11] when DeVarona tendered Python's corporate check and demanded release of Python's cargo.
 
 C. Doctrine of Avoidable Consequences
 
 30
 Sea-Barge argues, in the alternative, that if the district court had the necessary jurisdiction and grounds for its estoppel and conversion rulings, the court erred in failing to apply the doctrine of avoidable consequences to bar Python's recovery of damages. Sea-Barge argues that, "[w]hen Python realized that Sea-Barge would not accept its corporate check, Python incurred a duty to mitigate damages and avoid the consequences of Sea-Barge's action--i.e., tender cash or a cashier's check (United States currency)." (Appellant's Br. at 29). Because we have accepted the district court's factual finding that Sea-Barge's agents never informed Python's agents of the reason they were rejecting the corporate check, the doctrine is inapplicable. Manifest in this doctrine is the assumption that the injured party knows what reasonable efforts to use to mitigate damages. See Ford Motor Co. v. Dallas Power & Light Co., 499 F.2d 400, 414-15 (5th Cir.1974).[12]
 
 II. The District Court's Demurrage Ruling
 
 31
 In its original complaint, Sea-Barge sought demurrage allegedly due from Python for periods while the cargo remained on Sea-Barge's lots in Miami and San Juan. The district court concluded that Sea-Barge was not entitled to demurrage because a provision in its bill of lading provided that no demurrage would accrue for delays caused by Sea-Barge. On appeal, Sea-Barge contends that this conclusion is erroneous due to Python's failure to file a written claim for waiver of demurrage as required in the bill of lading. Additionally, Sea-Barge argues it was not at fault for the delays that resulted in the accrual of demurrage.
 
 
 32
 Sea-Barge made no demand for demurrage prior to trial. (R. 1-41 at 10). The district court determined that Python's answer denying liability for demurrage would suffice as a written claim for waiver under the circumstances. We find no error in this determination.
 
 
 33
 We also affirm the district court's finding that Sea-Barge was at fault for the delays that caused the demurrage to accrue. Demurrage accrued at two separate times. Initially, demurrage accrued for the time the cargo was in San Juan. Sea-Barge's loss of the Elegante deck mold resulted in the delay and subsequent accrual of demurrage in San Juan. Secondly, demurrage accrued for the time the cargo remained on Sea-Barge's lot in Miami. Because this demurrage accrued due to Sea-Barge's conversion of the cargo, the district court did not err in denying Sea-Barge's claim for demurrage for the time the cargo remained on the Miami lot.
 
 III. The Limitation of Liability Provision
 
 34
 A provision in Sea-Barge's bill of lading provides in pertinent part:
 
 
 35
 20. VALUATION. Carrier shall not be liable in any event for any loss, damage, misdelivery or delay with respect to the goods in an amount exceeding $500.00 lawful; money of the United States per package ... unless the nature of the goods and a valuation thereof higher than $500.00 is declared in writing by Shipper on delivery of the goods to carrier and inserted in the Bill of Lading and extra freight is paid thereon as required by the applicable tariff to obtain the benefit of such higher valuation, in which event Shipper agrees that the value of the goods shall not exceed such declared value, and any partial loss or damage shall be adjusted pro rata on the basis thereof.[13]
 
 
 36
 (Pl.'s Ex. 4) (emphasis added). At trial, Sea-Barge argued that this provision limited its liability for the lost Elegante mold to $500.00. The court found otherwise, concluding that Python had satisfied the requirements in the bill of lading to avoid the $500.00 limitation.
 
 
 37
 To satisfy this provision, the shipper must first value the cargo at an amount higher than $500.00. The district court concluded that Python had satisfied this provision due to its "declaration of a $100,000 value" in its booking notice with Sea-Barge. (R. 1-41 at 13). We disagree.
 
 
 38
 The shipper must declare the value of its cargo on the face of the bill of lading, not on some other related documents, to satisfy the valuation requirement. See Hoechst Celanese Corp. v. M/V Trident Amber, 1992 A.M.C. 2769, 2785, 1992 WL 179219 (S.D.Ga.1992) (value noted on commercial invoice not a declaration); Mack Trucks, Inc. v. Farrell Lines, Inc., 1990 A.M.C. 2669, 1990 WL 3926 (S.D.N.Y.1990) (value noted on dock receipt not a declaration); Sony Magnetic Prods., Inc. v. Merivienti O/Y, 668 F.Supp. 1505, 1512 (S.D.Ala.1987) (value noted on shipper's export declaration form not a declaration).
 
 
 39
 We note that an additional "$100,000" figure appears on the bill of lading. This, however, was the amount of insurance coverage Python sought--not a declaration of value for the purpose of satisfying the valuation requirement.[14]
 
 
 40
 The second requirement to avoid the limitation is that the shipper pay additional freight on the cargo, "as required by the applicable tariff to obtain the benefit of such higher valuation." (Pl.'s Ex. 4 "20. VALUATION"). The district court found that Python had satisfied this additional requirement by incurring the $50.00 additional charge for insurance. We disagree.
 
 
 41
 The additional freight requirement requires shippers to pay an amount in accord with filed ad valorem rates. See M/V Ocean Lynx, 901 F.2d at 940; Brown & Root, Inc. v. M/V Peisander, 648 F.2d 415, 421 (5th Cir.1981). The "AD VALOREM RATES" section of Sea-Barge's ICC Tariff provides, "[i]f the shipper declares a value in excess of that which would otherwise apply under this Item, the regular rate for the commodity will be assessed plus 2% (two percent) of the amount of the total declared value." (Pl.'s Ex. 28 at 21) (emphasis added). Had Python truly valued its cargo at $100,000.00 for purposes of the valuation requirement, an additional charge of $200.00 (2% of $100,000.00) would have been assessed. There is no such charge. Therefore, because Python did not satisfy either requirement, we conclude that the $500.00 package limitation applied to the lost Elegante mold.
 
 IV. Python's Claim for Lost Profits
 
 42
 On cross-appeal, Python argues the district court erred in rejecting its claim for lost profits. This claim is based on an alleged lease between Python and Top Performance for the use of the boat molds to manufacture boats in Puerto Rico. Because the lease was never consummated between the parties, the trial court concluded that the allegedly lost profits were too speculative. See Royal Typewriter Co. v. Xerographic Supplies Corp., 719 F.2d 1092, 1105 (11th Cir.1983) (Florida law requires lost profits claims to be proven with reasonable certainty). We find no error in this conclusion.
 
 CONCLUSION
 
 43
 In summary, we affirm the district court on all issues except the $500.00 liability limitation issue. On this issue, we reverse the award of damages for the lost Elegante mold. We remand this case to the district court with instructions to modify the judgment consistent with this opinion.
 
 
 44
 AFFIRMED in part; REVERSED and REMANDED in part.
 
 
 
 *
 Honorable Edward S. Smith, Senior U.S. Circuit Judge for the Federal Circuit, sitting by designation
 
 
 [1]
 An initial dispute between the parties was the number of boat molds delivered to Sea-Barge by Python. The district court determined that three molds were delivered and that one was subsequently lost while in the possession of Sea-Barge
 
 
 [2]
 "BRBK" is a shipping term which stands for "break bulk." The term relates to a classification of cargo used by Sea-Barge for computation of tariffs
 
 
 [3]
 Sea-Barge correctly notes that no agent or representative of Top Performance testified at trial to this effect and that the only evidence in the record relative to this issue was a hearsay statement offered by Mr. DeVarona concerning a conversation he had with Freddie Castro, a Top Performance representative. However, in light of the district court's finding that the deck mold was in fact missing and that a Sea-Barge agent, Mr. Felipe Inostroza, offered to return Python's cargo at no charge because of the loss of the mold, the reason for Top Performance's rejection is irrelevant to the issues on appeal
 
 
 [4]
 Sea-Barge takes issue with this finding by the district court, but the finding is not clearly erroneous; it is based on credibility choices from conflicting testimony
 
 
 [5]
 This amount equates with freight charges for the two-mold set's shipment from Miami to San Juan. The record does not reveal why freight charges for the shipment of the container from Miami to San Juan were not demanded
 
 
 [6]
 This $50.00 charge has never been paid because the terms of the initial shipment were "FREIGHT COLLECT" to be paid by the consignee, Top Performance
 
 
 [7]
 Sea-Barge contends that Python failed to raise equitable estoppel as an affirmative defense in any of its responsive pleadings to Sea-Barge's claim for freight and demurrage. Sea-Barge also maintains that the Pretrial Stipulation of factual and legal issues did not include the estoppel issue for resolution at trial. We conclude that Python sufficiently raised equitable estoppel as an affirmative defense in its answer. We similarly reject Sea-Barge's argument that the Pretrial Stipulation did not include the estoppel issue
 
 
 [8]
 Both parties and the district court relied on Florida law on the issue of equitable estoppel. However, under admiralty jurisdiction, general maritime law as developed by the federal courts is applicable. See Keefe v. Bahama Cruise Line, Inc., 867 F.2d 1318, 1320 (11th Cir.1989) (citing Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 628, 79 S.Ct. 406, 408, 3 L.Ed.2d 550 (1959)). We note, however, that Florida's equitable estoppel law is similar to federal law on the subject
 
 
 [9]
 The district court found DeVarona to be a credible witness and found Inostroza to be an unreliable witness. (R. 1-41 at 6 n. 5)
 
 
 [10]
 DeVarona testified that he offered the Python check for the freight charges and Inostroza said, "I can't release you [sic] the cargo." When DeVarona asked why, Inostroza responded, "[w]e just have to wait for our lawyer to let you know." (R. 3-208)
 
 
 [11]
 Sea-Barge argues that $3155.70 represents only freight charges for the Miami to San Juan trip for the two-mold set and therefore, the container could not have been converted because separate freight charges were applicable to it. However, Sea-Barge ignores its own agent's (Trapani) letter to Python which stated that payment of $3155.70 was the only requirement for release of all of Python's cargo. (Pl.'s Ex. 35)
 
 
 [12]
 In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981
 
 
 [13]
 This provision substantially mirrors 46 U.S.C. app. Sec. 1304(5) (1988)
 
 
 [14]
 This conclusion follows from a review of the bill of lading and Sea-Barge's ICC tariff. The "$100,000" figure was inserted in a section of the bill of lading marked "INSURANCE COVERAGE." Relevant language in the "INSURANCE" section of Sea-Barge's ICC tariff provides, "[s]hipper MUST indicate that cargo insurance is being requested and MUST stipulate the amount of coverage desired in the space provided on the Bill of Lading contract." (Pl.'s Ex. 28 at 51) (emphasis added)