KEARSE, Circuit Judge:
Plaintiff Eastern Air Lines, Inc. (“Eastern”), appeals from a final judgment of the United States District Court for the Southern District of New York, John E. Sprizzo, Judge, affirming an order of the bankruptcy court that dismissed Eastern’s complaint against defendant The Insurance Company of the State of Pennsylvania (“ISOP”) for the immediate refund of a premium overpayment under the terms of an insurance contract and of an additional amount of premium that allegedly exceeded the rate permitted by the State of Florida. The district court affirmed the bankruptcy court’s grant of summary judgment in favor of ISOP dismissing the complaint on the grounds that the insurance contract (a) was enforceable and (b) did not require ISOP to refund Eastern’s premium overpayment prior to January 31, 1994. On appeal, Eastern contends that it was entitled to judgment in its favor principally on the ground that the challenged premium term of the contract was invalid because ISOP failed to obtain Eastern’s consent to that term as required by Florida law and failed to file the contract with the pertinent Florida regulatory agency. For the reasons that follow, we disagree and affirm the judgment of the district court.
I. BACKGROUND
The present controversy centers on workers’ compensation insurance needed by Eastern in order to comply with various state laws and with provisions of its labor con *994 tracts. The relevant events are not in dispute.
A. The Negotiations and the Insurance Contract
In January 1989, Eastern’s insurance broker solicited from a number of insurance companies proposals for a nationwide worker’s compensation insurance policy to become effective upon the expiration of Eastern’s existing policy some three weeks thence. At that time it was common knowledge that Eastern was facing mounting labor and financial difficulties, and no insurance carrier was willing to issue to Eastern a “guaranteed cost” plan under which premium payments would be established chiefly on a prospective basis without regard to actual losses incurred. Instead, each carrier proposed a loss-sensitive plan, under which the premium would be calculated largely retrospectively by reference to Eastern’s actual loss claims.
ISOP proposed a loss-sensitive plan calling for Eastern to pay at the beginning of the coverage period a premium deposit, in cash and by letter of credit, totaling approximately $23 million, which approximated Eastern’s anticipated covered losses (including associated expenses). If it turned out that actual covered losses were significantly below the amount deposited, Eastern would be entitled to a partial refund. If, instead, it turned out that such losses significantly exceeded the initial deposit, Eastern would be required to pay additional premium; however, regardless of actual loss experience, the proposed plan set a ceiling, expected to be approximately $28 million, on Eastern’s premium (the “maximum premium”). The maximum premium was to be computed retrospectively essentially by multiplying Eastern’s actual payroll by two factors: (a) ISOP’s “filed rates,” and (b) a “maximum premium factor” of 1.6. Filed rates are, basically, multipliers that states require an insurer to file with state regulatory agencies; the insurer then multiplies the applicable filed rates by the insured’s payroll to yield a figure known as “standard audited premium.” Thus, ISOP’s proposed policy provided in essence that the formula for calculating Eastern’s maximum premium would be {Eastern’s actual payroll} x {ISOP’s filed rates} x 1.6; i.e., the maximum premium would be 160% of ISOP’s “standard audited premium.”
Eastern was amenable to ISOP’s proposal, except that it could not obtain a sufficiently large letter of credit to make an immediate deposit of $23 million. Following negotiations, ISOP agreed to accommodate Eastern’s financial condition by lowering the initial deposit amount, spreading deposit payments over a 10-month period, and forgoing any requirement that Eastern post collateral. In return for these concessions, Eastern agreed that if it were eventually entitled to a refund, ISOP would not be required to refund the paid-in premium, at least up to the amount of the maximum premium, prior to January 31, 1994.
Accordingly, Eastern and ISOP entered into a contract entitled “THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA WORKERS COMPENSATION DIVIDEND PLAN RATING AGREEMENT” (the “Plan” or “ISOP-Eastem Plan”), under which ISOP agreed to provide Eastern with nationwide workers’ compensation coverage for the period February 1, 1989, to February 1, 1990. With respect to Eastern’s premium deposit, the Plan provided that the “Expected Total Premium” was “$21,000,000” (Plan Addendum No. 1, at 1), of which $3,500,000 was to be paid by Eastern on February 1, 1989, with the remaining $17,500,000 paid in 10 equal monthly installments beginning on March 1, 1989. The Plan stated that the “Maximum Premium Factor” was “1.60.” (Plan at 1.)
With respect to the retrospective calculations of loss and the final premium amount payable by Eastern, the Plan provided, in pertinent part, as follows:
4. PREMIUM ADJUSTMENT PROCEDURES
After the initial twelve (12) months, losses will be examined quarterly. Ultimate loss levels will be estimated using the Table of Loss Development Factors indicated below. Final Premium and Dividend (if any) will be calculated and recorded. If at anytime, [sic ] the Final Premium indicated by these calculations exceeds the Paid-in Premium, the additional premium will *995 be immediately billed, subject to Maximum Premium Limitations. All billings will be due and payable within thirty (30) days.
5. PLAN TERM
The term of this plan is five (5) years. At the expiration of the term, the reported incurred losses will be adjusted to ultimate level using the appropriate Loss Development Factor, and will be considered final.
6. PLAN TERMINATION
Upon receipt of the January 31, 1994 Loss Report, the calculation of final premium and dividend (if any) will be made according to the formula contained in this plan. Any additional premium, subject to maximum premium limitation, will be immediately due and payable. Any dividend or return of paid-in premium will be immediately credited and the account will be closed.
(Plan Addendum No. 1, at 1-2.)
B. The Florida Statute
The largest portion of the risk covered under the Plan was in Florida, as the covered Florida residents outnumbered the covered residents of all other states combined. Florida has an elaborate insurance regulatory scheme, see generally Fla.Stat.Ann. § 627.011, et. seq., designed chiefly “to protect policyholders and the public against the adverse effects of excessive, inadequate, or unfairly discriminatory insurance rates,” id. § 627.031(2). To this end, each insurance company doing business in Florida and providing workers’ compensation coverage for residents of Florida is required to, inter alia, file with the Florida Department of Insurance (“FDOI” or the “Department”) every rating plan — i.e., the methodology by which the premium for an insurance policy is calculated — and every rating plan modification that the insurer proposes to use. See id. § 627.091(1). Such plans and plan modifications do not become effective as filed rates unless and until FDOI approves. See id. § 627.101(1).
Once approved, the filed rates must be adhered to by the insurer unless there is compliance with Fla.Stat.Ann. § 627.171. See id. § 627.211. At the times pertinent to this litigation, § 627.171 provided that a rate in excess of the otherwise applicable filed rate could be used with the “written consent of the insured filed with the insurer.” Id. § 627.171 (effective prior to October 1,1989). FDOI has taken the position that in order to comply with § 627.171, an insurer was required to have the insured sign a separate document that mentioned the statute and stated that the insured understood that he was agreeing to pay rates higher than those theretofore filed. (Deposition of James D. Watford, actuary in FDOI’s Division of Insurer Services, Bureau of Property and Casualty Forms and Rates, March 12, 1993, at 42-43.)
The Florida statute provides that if a term of an insurance policy violates one of these statutory provisions, the policy is not void but rather must be construed to conform with the statute. . See Fla.Stat.Ann. § 627.418. The ISOP-Eastem Plan was not filed with FDOI, and Eastern did not sign a separate form indicating its consent to a premium of 160% of the standard audited premium.
C. The Present Litigation
1. Proceedings in the Bankruptcy Court
Some five weeks after the Plan became effective, Eastern suffered a major labor strike and, on March 9, 1989, voluntarily petitioned in the Southern District of New York for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 et seq. (the “Code”). Eastern had made its initial payment of $3,500,000 as required by the Plan but had failed to make the $1,750,000 payment due on March 1.
Under the automatic-stay provisions of the Code, see 11 U.S.C. § 362(a), ISOP was prohibited from seeking judicial relief from its obligation to provide the agreed insurance coverage to Eastern on account of Eastern’s nonpayment of premium. On April 10, 1989, ISOP moved in the bankruptcy court for relief from the automatic stay, asking the court either (a) to permit ISOP to cancel the Plan, or (b) to order Eastern, as debtor-in-possession, to make the March 1 and April 1 installment payments and either assume or *996 reject the Plan in accordance with 11 U.S.C. § 365. Thereafter, ISOP and Eastern negotiated a revised payment schedule, pursuant to which, instead of 10 monthly payments of $1,750,000 each, Eastern would be allowed to make 18 monthly payments of $972,222.22 each.
In all other respects, the Plan was to remain unchanged. According to Eastern senior executive James McGuinness, who participated in the renegotiation, Eastern made no effort to renegotiate the maximum premium formula; nor was there any discussion of altering the time at which Eastern, if it overpaid, would be entitled to receive its refund. (Deposition of James McGuinness, February 1, 1993 (“McGuinness Dep.”) at 8-9.)
The parties’ revised agreement was approved by the bankruptcy court in a consent order dated November 8,1989 (“Consent Order” or “Order”), which provided in pertinent part as follows:
[I]t appearing that since March 9, 1989, the date on which Eastern filed a voluntary petition under chapter 11 of the Bankruptcy Code, ISOP has provided Eastern with the insurance coverage required by the terms of the [Plan], including, without limitation, defending and indemnifying Eastern for and against workmen[’s] compensation ... claims; and it further appearing that, as of November 1, 1989, Eastern was obligated to make premium payments under the [Plan] in the aggregate amount of $15,750,000; and Eastern and ISOP having agreed to a payment schedule with respect to past and future premium payments under the [Plan] which provides for the monthly premium payment of $972,222 for the period from March 1, 1989 up to and including August 1, 1990, together with interest accrued on all' outstanding past due premium payments at the rate of nine percent (9%) per annum; and the Court having determined that the revised payment schedule is in the best interest of Eastern, its estate, creditors and equity holders; and good and sufficient cause appearing therefor; it is hereby
ORDERED that the Motions, as they relate to the assumption of the [Plan] be and they hereby are, granted; and it is further
ORDERED that, except as modified herein, the [Plan] be, and ... hereby [is], assumed pursuant to section 365(a) of the Bankruptcy Code____
(Consent Order at 2-3.) The Order directed Eastern to make a payment of $8,749,998 (ie., the total payments due for March 1, 1989, through November 1, 1989, under the revised agreement), plus interest, within three business days of the entry of the Order; and it ordered Eastern to pay ISOP $972,222 on December 1, 1989, and on the first of each month thereafter through August 1, 1990. The court stated that “such payments shall constitute adequate assurance of Eastern’s future performance under the [Plan]....” Id. at 3.
In March 1991, after the coverage period under the Plan had expired and Eastern had made premium payments totaling $21 million in compliance with the revised payment schedule, ISOP audited Eastern’s payroll. Due predominantly to the labor strike, which had dramatically reduced Eastern’s work force and consequently its payroll, the maximum premium Eastern was obligated to pay {ie., 160% of standard audited premium based on filed rates and payroll) was less than $12 million. Thus, Eastern’s premium deposit exceeded the maximum premium by some $9 million. Moreover, the claims against Eastern did not decline in proportion to its payroll decline. The covered claims exceeded $18 million and hence exceeded Eastern’s maximum premium by more than $6 million.
In March 1992, after Eastern’s bankruptcy trustee (“Trustee”), who had been appointed in April 1990, received ISOP’s audit results, he demanded that ISOP' immediately refund the amount by which the premium Eastern had paid exceeded the maximum premium (the “contractual premium overpayment”). In response, ISOP, relying principally on Paragraphs 5 and 6 of Plan Addendum No. 1, quoted in Part I.A above, stated that it would refund the $9 million contractual premium overpayment, but not until 1994.
*997 In September 1992, the Trustee filed an adversary proceeding in bankruptcy court to recover the contractual premium overpayment and to challenge the formula by which Eastern’s maximum premium was set in the Plan. The Trustee contended principally that the Plan was a rating plan governed by the Florida statute; that ISOP was therefore required to file- the Plan with FDOI; that under Florida law ISOP was prohibited, unless Eastern consented in a separate consent form, from charging a maximum premium based on any rate higher than ISOP’s previously filed rates; that Eastern had not so consented; and that the Plan’s provision for a maximum premium of 160% of the standard audited premium based on filed rates was therefore invalid. The Trustee thus sought to hold ISOP to a maximum premium calculated without the 1.6 multiplier provided for in the Plan, and to recover a total of some $13 million. He also argued that under the provisions of Paragraph 4 of Plan Addendum No. 1, ISOP was required to refund to Eastern the contractual premium overpayment immediately.
ISOP moved for summary judgment. It argued, inter alia, (a) that the Plan was not subject to the Florida requirements of filing and written consent because it was not a rating plan but was exclusively a dividend plan, (b) that even under Florida law, Eastern’s negotiation of and agreement to the written contract specifying the 1.6 multiplier constituted the necessary written consent to a premium higher than ISOP’s previously filed rates, and (c) that in any event, no provision of the Florida statute or the contract required the return of Eastern’s overpayment prior to January 31,1994.
In an oral decision issued on June 15,1993, the bankruptcy court granted ISOP’s motion, ruling that although Florida law was controlling, the Plan was not a rating plan and hence did not fall within the scope of the Florida provisions that prohibited such plans and/or required filings with FDOI. The court found that in agreeing to the Plan, the parties had clearly and unambiguously agreed that Eastern’s premium would be calculated by applying a 1.6 multiplier to ISOP’s standard audited premium and that the refund of any contractual premium overpayment would not be due before January 31, 1994.
2. The District Court’s Decision
Eastern appealed the bankruptcy court’s ruling to the district court, pursuing its contentions that, under the Florida statute, ISOP was not permitted to charge Eastern a maximum premium based on a rate higher than filed rates and was required to return any premium overpayment immediately. The district court, in an opinion dated March 27, 1995, and reported sub nom. Shugrue v. Insurance Co. of Pennsylvania, 180 B.R. 53 (S.D.N.Y. 1995) (“District Court Opinion”), affirmed the dismissal of Eastern’s claims, though on grounds different from those adopted by the bankruptcy court. The district court found that New York law, which did not impose requirements similar to those of the Florida statute, was applicable; but, assuming arguendo that Florida law applied and that the Plan was a rating plan within the scope of the Florida statute, the district court concluded that Eastern had adequately consented to the Plan’s provision for a maximum premium of 160% of ISOP’s standard audited premium. The court further concluded that, even if there had not been full compliance with the Florida statute’s procedural formalities, Eastern was nonetheless equitably estopped from attempting to pay a premium based on a rate below that to which it had agreed both originally and in the context of the bankruptcy proceeding. The court reasoned in pertinent part as follows:
An argument is made here by [ISOP] that ... a[] provision of Florida law .-.. allows a contract to be filed which contains a rate other than that specified in the filed rate, where there is consent of the parties. ... However, [Eastern] argues that for that provision to apply, some written consent other than that which is embodied in the contract itself is required.
[ISOP] responds to that argument by contending that there can be no rational basis for not finding consent here because consent is established not only by the contract itself but also by the circumstance that [Eastern] again independently con *998 sented, when, after the bankruptcy petition was filed, the trustee had the opportunity to disaffirm the contract but instead sought the authority of the Bankruptcy Court here in New York, on the record, to ratify the provisions of the contract at issue.
I find [ISOP’s] argument more persuasive on that issue. Even if I were to assume arguendo that some consent other than the contract would be required, I think under the facts presented here it is clear that there is not only written consent to the rate in the contract itself, but also that an additional consent was made in open court. For both of those reasons I cannot reach the conclusion that the failure to file a separate consent document with both the insured and the regulating agencies affords a basis to provide the relief appellant sought in its motion for summary judgment.
Moreover, I think that well-settled principles of estoppel dictate that where a party seeks the benefits of a contract, it cannot disaffirm its burdens. Warren v. Hudson Pulp & Paper Corp., 477 F.2d 229, 236 (2d Cir.1973); Fineberg v. E.B. Kline, 542 So.2d 1002, 1004 (Fla.Dist.Ct.App.3d Dist.1988)....
The Court finds, therefore, that there was adequate consent to a rate other than the filed rate, and that therefore failure to file the rate as set forth in the contract with the rating agencies did not violate Florida law. In any event, principles of estoppel foreclose the issue of consent being raised as a basis to challenge a contract the trustee has chosen to affirm.
District Court Opinion, 180 B.R. at 55-56.
Finding the Plan’s language “unambiguous,” the district court also rejected Eastern’s contention that ISOP was required to refund the contractual premium overpayment immediately after learning the results of the 1991 audit, stating that
the unambiguous language of the contract supports [ISOP’s] view that there was no requirement to pay back premiums prior to ... January 31, 1994. I think the language relied upon by [Eastern] does not support [its] interpretation.... The Court finds no merit to [Eastern’s] argument that somehow the premiums were required to be paid back sooner based upon provision 4 of the contract as opposed to provision 6 of the contract, which the Court finds to be clearly applicable.
Id. at 57 (footnotes omitted).
II. DISCUSSION
On appeal to this Court, Eastern pursues its contentions that ISOP’s failure to file the Plan with FDOI and to obtain Eastern’s consent to the higher rate in a separate consent document violated Florida law, that in light of those violations the Plan must be treated as if the premium payable by Eastern were no greater than ISOP’s standard audited premium based on its previously filed rates, and that the overpayment of premium was required to be refunded immediately. FDOI, as amicus curiae, has filed a brief in which it, inter alia, endorses Eastern’s contentions that Florida law required ISOP to file the Plan and seek approval of the Department. FDOI also states that it likely would not have approved the Plan had it been properly submitted, that the provision for a 1.6 multiplier should thus be deemed a nullity, and that ISOP was required to return Eastern’s overpayment as soon as it became aware that Eastern had overpaid.
We find in these contentions no ground for reversal. In light of the facts that Eastern, in its bankruptcy proceeding, persuaded ISOP to renegotiate the Plan, with modifications only of Eastern’s payment schedule and without challenge to the Plan’s maximum premium formula, and persuaded the bankruptcy court to permit Eastern to assume the Plan as renegotiated, we conclude that even if the Florida statute should ordinarily be interpreted as urged by Eastern and FDOI, the district court correctly affirmed the dismissal of Eastern’s claims.
A. The Bankruptcy Code and Equitable Principles
A bankruptcy debtor, or its trustee, is allowed, with the permission of the bankruptcy court, to assume an executory contract, ie., a contract “on which performance *999 remains due to some extent on both sides,” National Labor Relations Board v. Bildisco & Bildisco, 465 U.S. 513, 522 n. 6, 104 S.Ct. 1188, 1194 n. 6, 79 L.Ed.2d 482 (1984) (internal quotation marks omitted), and thereby prevent the other contracting party from terminating the contract. See 11 U.S.C. § 365 (rights and powers of trustee); id. § 1107(a) (giving substantially identical rights and powers to debtor-in-possession). If the debtor is in default on the contract, it will not be allowed to assume the contract unless, at the time of the assumption it, inter alia, (a) cures, or provides adequate assurance that it will promptly cure, the default, and (b) provides adequate assurance of its future performance of its obligations under the contract. See id. § 365(b). Congress’s intent in imposing these conditions on the ability of the debtor to assume the contract was “to insure that the contracting parties receive the full benefit of their bargain if they are forced to continue performance.” In re Superior Toy & Manufacturing Co., 78 F.3d 1169, 1174 (7th Cir.1996) (“ ‘If the trustee is to assume a contract or lease, the court will have to insure that the trustee’s performance under the contract or lease gives the other contracting party the full benefit of his bargain.’ ” (quoting S.Rep. No. 989, 95th Cong., 2d Sess. 59 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5845; H.R.Rep. No. 595, 95th Cong., 2d Sess. 348 (1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6304-05.)).
The bankruptcy court is essentially a court of equity. See, e.g., National Labor Relations Board v. Bildisco & Bildisco, 465 U.S. at 527, 104 S.Ct. at 1196-97; Bank of Marin v. England, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966). Its “proceedings [are] inherently proceedings in equity,” Local Loan Co. v. Hunt, 292 U.S. 234, 240, 54 S.Ct. 695, 697, 78 L.Ed. 1230 (1934), and it “applies the principles and rules of equity jurisprudence,” Pepper v. Litton, 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939), including principles of estoppel, see generally, e.g., Momentum Manufacturing Corp. v. Employee Creditors Committee, 25 F.3d 1132, 1136 (2d Cir.1994) (debtor that had represented that employees would receive severance payments, and thereby obtained needed votes from the employees in favor of reorganization plan, was estopped from amending plan to eliminate severance); In re Garfinkle, 672 F.2d 1340, 1346-48 (11th Cir.1982) (purchasers estopped from seeking recovery of deposit made pursuant to court-approved contract). The existence of a complex statutory scheme governing the underlying contracts does not necessarily impede the court’s exercise of its equitable powers. See, e.g., Momentum Manufacturing Corp. v. Employee Creditors Committee, 25 F.3d at 1137 (bankruptcy court’s power to find an equitable estoppel not preempted by ERISA).
Equitable estoppel is grounded on notions of fair dealing and good conscience and is designed to aid the law in the administration of justice where injustice would otherwise result. See, e.g., Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 301 (2d Cir.1996); Marine Transportation Services Sea-Barge Group, Inc. v. Python High Performance Marine Corp., 16 F.3d 1133, 1138 (11th Cir.1994). The doctrine is “imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party’s words or conduct, has been misled into acting upon the belief that such enforcement would not be sought.” Readco, Inc. v. Marine Midland Bank, 81 F.3d at 301.
One species of equitable estoppel is promissory estoppel, which may be applied where there has been a clear and unambiguous promise, reasonable and foreseeable reliance on the promise, and an unconscionable injury as a result of the reliance. See, e.g., id.; Merex A.G. v. Fairchild Weston Systems, Inc., 29 F.3d 821, 824 (2d Cir.1994), cert. denied, — U.S. -, 115 S.Ct. 737, 130 L.Ed.2d 639 (1995); Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 73 (2d Cir.1989); Pinnacle Port Community Association v. Orenstein, 872 F.2d 1536, 1543 (11th Cir.1989); W.R. Grace & Co. v. Geodata Services, Inc., 547 So.2d 919, 924 (Fla.1989); Mount Sinai Hospital of Greater Miami, Inc. v. Jordan, 290 So.2d 484, 486 (Fla.1974). “Based on equitable principles, *1000 once a party accepts the proceeds and benefits of a contract, that party is estopped from renouncing the burdens the contract places upon him.” Fineberg v. Kline, 542 So.2d 1002, 1004 (Fla.Dist.Ct.App.3d Dist.1988), rev. denied, 553 So.2d 1165 (Fla.1989). Indeed, where breach of the promise causes unconscionable injury, the principle of promissory estoppel allows enforcement of the promise even in the absence of an enforceable contract. See Crown Life Insurance Company v. McBride, 517 So.2d 660, 662 (Fla.1987); D & N Boening, Inc. v. Kirsch Beverages, Inc., 99 A.D.2d 522, 524, 471 N.Y.S.2d 299, 302 (2d Dep’t), aff'd, 63 N.Y.2d 449, 483 N.Y.S.2d 164, 472 N.E.2d 992 (1984).
Where a debtor has been permitted by the bankruptcy court to assume a contract pursuant to § 365, equitable estoppel principles may be applied by the court to deny the debtor permission to escape its obligation to perform the contract it assumed. For example, in In re Superior Toy & Manufacturing Co., 78 F.3d 1169, the debtor (“Superior Toy”) held an exclusive license from the defendant (“Playtex”) to distribute a line of trademarked toys throughout North America; as debtor-in-possession, Superior Toy successfully petitioned the bankruptcy court pursuant to § 365 for permission to assume the licensing agreement. For the next two years, Superior Toy enjoyed the exclusive rights conferred by the license. Thereafter, a trustee appointed for Superior Toy commenced an action under 11 U.S.C. § 547, claiming that prebankruptcy payments made to Playtex pursuant to the license constituted a preference and should be returned to Superior Toy. The bankruptcy, district, and appellate courts rejected the trustee’s contention that a bankruptcy debtor can assume a contract, enjoy its benefits, and then compel return of the payments the debtor made pursuant to the contract. The court of appeals ruled that under the Code “[a]n assumption order divests the trustee of subsequent claims to monies paid under the contract whether they were paid prepetition or postpetition,” 78 F.3d at 1174, and further reasoned that
[t]he trustee’s predecessor assumed the license agreement with court approval. Playtex honored the contract, and allowed Superior Toy to retain an exclusive license. The bankruptcy estate benefitted from the contract for almost two years. The trustee cannot now come forward and argue that the contract is not executory and that the payments to Playtex should be returned. To hold otherwise, without some allegation of improper conduct by the parties, would be unfairly prejudicial to Playtex.
Id. See also Seidle v. GATX Leasing Corp., 778 F.2d 659 (11th Cir.1985) (after parties entered into a court-approved stipulation pursuant to 11 U.S.C. § 1110, which permits debtor-in-possession to retain possession of equipment by curing defaults and making the required payments, trustee is precluded as a matter of law from bringing a preference suit under § 547 to recapture prepetition contract payments); Lewis Industries v. Barham Construction Inc., 878 F.2d 1230, 1231 (9th Cir.1989) (where bankruptcy court has entered an order granting debtor’s petition to assume a contract, debtor is estopped from later claiming a breach of which it knew but which it failed to raise at the assumption hearing); In re J.F. Hink & Son, 815 F.2d 1314, 1318 (9th Cir.1987) (where lessor represented to the debtor and the court that he consented to the terms of a lease, and thus “induced reliance by the other principal parties and by the court itself,” lessor was es-topped to “deny that he accepted all the terms”). In sum, the bankruptcy court “will act to assure that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done.” Samuel v. Baitcher, 781 F.2d 1529, 1533 (11th Cir.1986) (internal quotation marks omitted). “The notion that a party in bankruptcy can be permitted to thwart a bankruptcy order which has been conceived and fostered through its participation has been vigorously rejected.” In re J.F. Hink & Son , 815 F.2d at 1318.
B. The Present Case
These principles of estoppel were plainly applicable in the present case and were properly applied by the district court. There can be no question that the Plan was of benefit to Eastern. As McGuinness testified, during the negotiation of the revised *1001 payment schedule “there was a whole question of affirmation or rejection of the contract with respect to workers compensation, in order to continue operating in the various states. It was something that we were required to have, and also, for various contractual purposes under our labor agreements.” (McGuinness Dep. at 6.)
In renegotiating the premium payment schedule, Eastern made no effort whatever to alter the formula for computing the maximum premium; according to McGuinness, that question was not even discussed. In seeking the bankruptcy court’s approval for its assumption of the renegotiated Plan, which modified only the premium payment schedule, Eastern made no claim whatever that the Plan violated Florida law, or that the 1.6 multiplier was invalid, or that Eastern had not consented to the 1.6 multiplier. Eastern has not claimed that it was unaware of the fact that the Plan called for a maximum premium that exceeded ISOP’s previously filed rates. Nor would a claim of ignorance be plausible, for the formula stated in the Plan expressly called for those rates to be multiplied by “1.60.”
Nor is there any question that allowing Eastern to alter the premium formula to which it agreed would cause ISOP substantial prejudice. Even without the adjustment Eastern seeks, ISOP suffered a loss of some $6 million as a result of the facts that (a) Eastern’s decline in payroll resulted in a maximum premium of $12 million, ie., less than half the $28 million anticipated, and (b) the claims to be paid by ISOP, which (with associated expenses) were originally expected to total some $23 million, did not decline proportionately and totaled more than $18 million. If Eastern were to succeed in having its maximum premium calculated without the 1.6 multiplier to which it agreed, ISOP’s losses would be increased by some $4 million.
Further, during the period of the renegotiation and submission of the revised agreement to the bankruptcy court for approval of its assumption by Eastern, Eastern was well aware of the patterns that would lead ISOP to suffer losses as a result of the contract. First, as McGuinness testified, “In March of 1989, the company went into bankruptcy. We experienced, as you can imagine, dramatic changes in our work force” (McGuinness Dep. at 5-6); as of March 9, “the magic date, our world changed radically. Our work force dropped tremendously, and the premiums that we were paying, obviously, related to a much larger work force” (id. at 7). Since Eastern’s payroll was a key factor in the formula, that dramatic decline meant that Eastern’s maximum premium would likewise decline dramatically. Second, Eastern was aware that workers’ compensation claims would not decline correspondingly. McGuinness testified that, “It appeared that there had been a large number of cases filed immediately prior to the strike. Those persons, who contemplated going out on strike, and possibly being out on the street for some lengthy period, had filed an inordinate number of cases.” (Id. at 10.) Thus, when Eastern renegotiated the payment schedule, it was aware that its payroll, and hence its maximum premium, was substantially lowered and that the number of claims would be disproportionately high.
In sum, Eastern apparently could not meet the premium payment schedule originally called for by the Plan; yet it needed workers’ compensation coverage in order to continue to operate. Promising to perform its obligations under the Plan with only the payment schedule altered, and remaining silent as to the contentions advanced in this litigation that it had not adequately given its consent to the 1.6 multiplier provided by the Plan, that that multiplier was unenforceable, and hence that its maximum premium should be less than the amount called for by the Plan, Eastern persuaded ISOP to agree to a relaxed premium payment schedule and to continue to provide insurance coverage. It similarly persuaded the bankruptcy court to approve Eastern’s assumption of the renegotiated Plan pursuant to § 365, under which the bankruptcy court could not allow Eastern to assume the Plan unless the court were adequately assured that Eastern itself would perform under the renegotiated Plan. If Eastern wished to eliminate the 1.6 multiplying factor to which it had agreed, which could only increase ISOP’s already predictable substantial losses, it was incumbent upon East *1002 ern to make that disclosure to ISOP during the renegotiations and to the bankruptcy court before obtaining that court’s approval for Eastern’s assumption of the renegotiated Plan as written, without the elimination of that factor. We conclude that the district court properly held that Eastern, by reason of its conduct in renegotiating with ISOP and in securing judicial approval of the renegotiated agreement, was estopped from opposing enforcement of the agreement as renegotiated and as judicially approved.
We also agree with the district court, substantially for the reasons stated in its opinion, that under the terms of the Plan ISOP was not required to refund the contractual premium overpayment to Eastern prior to January 31,1994.
CONCLUSION
We have considered all of Eastern’s contentions on this appeal and have found in them no basis for reversal. The judgment of the district court is affirmed.