In re TEXACO INC., Texaco Capital Inc., Texaco Capital, N.V., Reorganized Debtors.

Texaco Inc., Movant,

v.

Board of Commissioners for the La-Fourche Basin Levee District, et al., Respondents.

Nos. 87B20142 (ASH), 87B20143 (ASH), 87B20144 (ASH).

United States Bankruptcy Court, S.D. New York.

Oct. 10, 2000.

540

Weil, Gotshal & Manges, by Martin J. Bienenstock, New York City, for reorganized debtor and movant.

Caplin & Drysdale, Chartered, by Peter Van N. Lockwood, New York City, for respondents.

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

## Table of Contents

| | Page |
|---------------------------------------------------------------------------------|------|
| Summary | 541 |
| Background | 542 |
| The Texaco bankruptcy | 542 |
| The "Global Motion" for assumption of oil and gas agreements | 542 |
| Texaco's "reserv[ation of] its rights to contend" in paragraph 41 | 546 |
| The July 10 Order | 546 |
| The October 7 Order | 550 |
| The Louisiana Land case | 551 |
| The Levee District Leases and State Court Claims | 552 |
| Texaco's Position on this Motion | 555 |

DISCUSSION ................................................556

 I. Failure to assume leases did not result in discharge of Texaco's ongoing
 and future obligations as lessee-operator ................................556

 II. Equitable estoppel and Constitutional due process preclude the relief
 sought by Texaco .......................................................560

 III. The October 7 Order may not be given effect contrary to the expectations
 of the parties, the Court and the decision in <u>Louisiana Land</u> ................563

Order Denying Texaco's Motion.............................................565

## *DECISION ON WHETHER UNFILED FUTURE CONTRACT CLAIMS ARE DISCHARGED BY CONFIRMATION*

This contested matter raises once again, in a new and different context, the much litigated question of whether claims asserted against a reorganized debtor long after confirmation of a Chapter 11 Plan are to be held discharged and barred because they allegedly arose and should have been asserted pre-confirmation. At stake here are alleged contractual and statutory environmental remediation and land loss restoration claims aggregating over $60 million purportedly arising from decades of profitable oil and gas drilling and production under four oil and gas leases. The decision in this matter may affect similar claims which may arise in future years and decades under tens of thousands of Texaco oil and gas leases similarly affected by an order of this Court signed in October 1987.

In March 1988 reorganized debtor Texaco Inc. ("Texaco") obtained an order of this Court (the "Confirmation Order") confirming its Second Amended Joint Plan of Reorganization (the "Plan"). Almost ten years later in April 1997 the LaFourche Basin Levee District ("LBLD") and the West Jefferson Levee District ("WJLD") (collectively, the "Levee Districts") commenced an action in the 17th Judicial District for the Parish of LaFourche, Louisiana (the "State Court Action") against Texaco, its wholly-owned subsidiary Texaco Exploration and Production, Inc. ("TEPI") and two other defendants. The complaint asserted claims (the "Claims" or "Levee District Claims") by the Levee Districts as lessors "for cancellation of mineral leases for active breach, and for damages" against Texaco and TEPI as lessees in respect of four oil and gas leases (the "Leases" or "Levee District Leases").

In July 1998 Texaco made the instant motion (the "Motion") in this Court for an order to bar the Levee District Claims on the ground that the Claims should have been filed in Texaco's Chapter 11 case and, not having been filed, were discharged by the Confirmation Order. The Motion is based solely on an order entered by this Court (Hon. Howard Schwartzberg, B.J.) in October 1987 stating that over 25,000 Texaco oil and gas leases including the Levee District Leases were "not subject to Bankruptcy Code section 365" and, for that reason alone, were not assumed. If the Leases had been assumed, Texaco acknowledges that the Claims would not have been discharged.

Both sides have cross-moved for summary judgment. There being no material issues of fact requiring a trial, Texaco's Motion is ripe for determination. The Court has jurisdiction under 28 U.S.C. §§ 1334 and 157 and the standing order of reference dated July 10, 1984.

### *Summary*

Texaco filed under Chapter 11 for the sole purpose of compromising a $10.5 billion judgment. Texaco continued to operate its oil and gas agreements after Confirmation and continued to derive the benefits of and honor its obligations un-

der those agreements, including the Levee District Leases. No prior notice was given that, if leases were declared not subject to Section 365, Texaco might decline on that ground to honor its "prudent operator" contractual and statutory lessee obligations as they arose in the ordinary course after Confirmation. No prior notice was given that, if leases were declared not subject to Section 365, counter-parties to such leases were required to file before Confirmation claims based on contractual or statutory clean-up or restoration obligations which Texaco might not honor in the future, including claims which did not then exist, might never arise or might not arise for years or decades.

The Levee District Claims are based upon Texaco's ongoing contractual and statutory duties as operator under the Levee District Leases. Having continued to operate and derive the benefits of billions of dollars of revenues under its thousands of oil and gas leases, Texaco may not now avoid its obligations as lease operator simply on the ground that the leases were not assumed or assumable under Section 365. As this Court (Hon. Howard Schwartzberg, B.J.) said in *In re Yonkers Hamilton Sanitarium Inc.,* 22 B.R. 427, 435 (Bankr.S.D.N.Y.1982):

> As long as the debtor continues to receive benefits under such contract [a contract that was neither assumed nor rejected under Section 365] it must also bear the burdens or obligations imposed under the contract.

For this and other reasons amplified below, Texaco's Motion must be denied.

### Background

#### The Texaco bankruptcy

Texaco is a publicly-held corporation which filed for relief under Chapter 11 of the Bankruptcy Code on April 12, 1987. The filing resulted from the highly-publicized $10.5 billion verdict in favor of Pennzoil which a Texas jury rendered on November 19, 1985. At that time Texaco was a profitable major international oil company with a $2 billion net worth based on book value. The sole reason for Texaco's filing under Chapter 11 was to prevent the enormous Pennzoil verdict from crippling the Company. In every other respect Texaco's declared objective was to continue its profitable global operations in the ordinary course of business post-petition and post-confirmation. Texaco ultimately succeeded in compromising the Pennzoil judgment for $3 billion. Under its Plan all Texaco's other creditors and all its equity interests were unimpaired.

#### The "Global Motion" for assumption of oil and gas agreements

The signal feature of this bankruptcy was that, with the exception of wrestling with the gargantuan Pennzoil judgment, Texaco otherwise sought to maintain its operations in the normal course of its business. The mainstay of its business was the oil and gas operations, and it was Texaco's stated and much-publicized effort to continue to operate its oil and gas business in the ordinary course. Central to Texaco's oil and gas operations were its 55,000 oil and gas agreements, including some 51,000 oil and gas leases, which generated annual cash flow of $1.5 billion.

Section 365(a) of the Bankruptcy Code provides that a debtor-in-possession "may assume or reject any executory contract or unexpired lease of the debtor." Under Section 365(d)(4) if the debtor does not assume or reject an unexpired lease of non-residential real property within 60 days after filing, the lease is deemed rejected and the debtor "shall immediately surrender" the property to the lessor. Reciting thusly the operation of Section 365 and noting the clear prejudice to its estate that would result from "[f]orfeiture by rejection of its Oil and Gas Agreements" (Global Motion ¶ 46), and considering "the size and complexity of Texaco's oil and gas operations and its need to operate in the ordinary course of business," Texaco sought "a practical, realistic and streamlined procedure for its *assumption*" of its

oil and gas agreements (Global Motion ¶ 47; emphasis supplied).

The vehicle for achieving this objective was a motion filed by Texaco on June 9, 1987, referred to as the "Global Motion." The Notice of Motion in its heading and again in its text sought

> an order authorizing payments in respect of, and assumption of, oil and gas leases, mineral servitudes, subleases, farmout agreements, operating agreements, unit agreements, joint venture agreements, exploratory agreements and certain supply agreements.... (emphasis supplied)

The proposed Order annexed to the Global Motion as Exhibit E and referred to in paragraph 47 (quoted below) (the "Exhibit E Order") is entitled "ORDER (i) APPROVING ASSUMPTION BY TEXACO INC. OF ITS OIL AND GAS LEASES ...". The first decretal paragraph in the Exhibit E Order provided that it is

> ORDERED that the instant assumption by Texaco of all its Oil and Gas Agreements, be and it hereby is, approved to the extent that each is an executory contract or unexpired lease of real property subject to the procedure set forth in the notice attached hereto as Exhibit I for parties to the Oil and Gas Agreements to contest the assumption .... (emphasis supplied)

Annexed to the Global Motion as a single voluminous exhibit were copies of exemplars of the oil and gas leases and other agreements which Texaco purportedly sought to assume. Included in this exhibit was a standard Louisiana oil and gas lease substantially the same in content as the Levee District Leases.

To better understand the state of affairs facing Texaco at the threshold of its Chapter 11 case, its business objectives and, most significantly, what Texaco communicated to the counter-parties on its oil and gas agreements, it will be helpful to quote portions of the Global Motion at length. Texaco described its operations and intentions as to its oil and gas agreements as follows:

4. Texaco and all its subsidiaries and affiliates represent a vertically integrated business enterprise principally involved in the petroleum and natural gas business, including petrochemicals. Together with non subsidiary companies owned 50% or less, Texaco and its subsidiaries are engaged in the worldwide exploration for and production, transportation and refining and marketing of crude oil and related products, including petrochemical....

\* \* \* \* \* \*

6. Texaco is a Delaware corporation whose securities are traded on the New York Stock Exchange. As of December 31, 1986, Texaco had approximately 278,000 stockholders and approximately 242,000,000 shares of common stock issued and outstanding. The entire Texaco enterprise employes [sic] in excess of 51,000 people. For the fiscal year ending December 31, 1986, the Texaco enterprise had revenues in excess of $31.6 billion.

\* \* \* \* \* \*

9. ... [T]he assets of Texaco at book value (approximately $18.3 billion) exceed its liabilities by approximately $2 billion.

\* \* \* \* \* \*

10. The mainstay of Texaco's business is its oil and gas operations. Texaco operates the bulk of the oil and gas wells in which it owns interests, but also owns substantial interests in wells operated by others. This application is to enable Texaco to assume its oil and gas leases and operating agreements in respect of all its oil and gas interests so as to preserve its revenues from oil and gas operations. In order to assume the operating agreements Texaco will pay approximately $55 million in prepetition debt obligations. Absent assumptions, Texaco stands to lose substantially more than $55 million. Additionally, this ap-

plication is to obtain an order facilitating Texaco's day-to-day, ordinary course oil and gas transactions. (emphasis supplied)

\* \* \* \* \* \*

12. *Mineral Interest Owners And The Conveyance Of Their Oil And Gas Rights.* ... In some states the oil and gas lease is referred to as a mineral servitude and in some instances the chain of ownership of a lease or mineral servitude will include a sublease. For purposes of this application, the term "lease" unless otherwise noted is intended to include mineral servitudes and subleases.

\* \* \* \* \* \*

15. *Oil and Gas Leases.* There is a general similarity in the practice of periodic royalty payments and the existence of certain obligations between mineral interest owners, working interest owners and overriding royalty interest owners under oil and gas leases in various states and pursuant to federal law. Nonetheless, there are variances in the underlying nature of oil and gas leases from state to state primarily because of variances in state and federal laws. Samples of standard oil and gas leases used by Texaco in several states in which it conducts substantial oil and gas business are attached as Exhibit A hereto. [Included in Exhibit A was a standard form Louisiana oil and gas lease substantially similar to the Levee District Leases.]

\* \* \* \* \* \*

23. ... Texaco, as lessee, is a party to approximately 51,000 oil and gas leases relating to approximately 10,000 properties covering 10 million acres in 24 states and on the Outer Continental Shelf....

\* \* \* \* \* \*

46. Texaco's oil and gas operations generate *annual cash flow of $1.5 billion.* Accordingly, to the extent its oil and gas leases are considered unexpired leases and to the extent its Unit Agreements and Division Orders are executory agreements, *Texaco's business judgment mandates assumption to preserve valuable assets.* Texaco's operating agreements, farmout agreements, joint venture agreements and exploratory agreements are clearly executory contracts and clearly beneficial for Texaco to assume for the reasons described above. Notwithstanding the assumption of these many thousands of executory contracts, Texaco's cure of prepetition defaults under these agreements will only cost it an estimated net $39 million. To this amount, Texaco seeks to add another $5 million for payment to certain vendors exhibiting hardship, for a total estimated net expenditure of $44 million. *Forfeiture by rejection of its Oil and Gas Agreements would clearly prejudice Texaco's estate.* (emphasis supplied)

\* \* \* \* \* \*

47. *Due to the size and complexity of Texaco's oil and gas operations and its need to continue to operate in the ordinary course of business, Texaco requests that the Court sanction a practical, realistic and streamlined procedure for its assumption and assignment of its Oil and Gas agreements,* **which procedure is set forth on Exhibit E hereto.** It would clearly result in an enormous and costly administrative burden to the estate, would unnecessarily distract management from the day-to-day operations, would tie up valuable resources and may jeopardize important business opportunities if Texaco is unable to assume and assign Oil and Gas Agreements expeditiously. (emphasis supplied)

In further support of the Global Motion to assume oil and gas leases, Texaco emphasized its substantial exposure to plugging, abandonment and clean-up costs in the event of termination, or rejection, of oil and gas leases, stating:

39. ... The alternative to selling these marginal leases is to terminate them. Termination of these leases requires Texaco to incur the costs of plugging and abandoning the wells thereon.

\* \* \* \* \* \*

43. ... Oil and gas leases are typically terminable at will by lessees by abandonment or termination for failure to drill or pay delay rentals. *Termination is without cost to the lessee except for possible plugging, abandonment and clean-up costs if wells have been drilled. Furthermore, liabilities for plugging and abandonment of leases exist independent of whether the lessee has assumed the lease at issue.* (emphasis supplied)

To summarize, the Global Motion communicated several dominant themes to Texaco's oil and gas lessees. The core of Texaco's multi-billion dollar oil and gas business was its oil and gas operations, comprised of 55,000 oil and gas agreements of which 51,000 were leases. To preserve these valuable assets and $1.5 billion annual cash flow it was imperative for Texaco to continue operating in the normal and ordinary course of its business, and Texaco intended to do so. To that end, the Global Motion sought Bankruptcy Court sanction for "a practical, realistic and streamlined procedure for its assumption and assignment of its Oil and Gas Agreements" in the form of the Exhibit E Order annexed to the Global Motion, which provided for "*assumption* by Texaco of *all* its Oil and Gas Agreements." The Global Motion emphasized Texaco's intention to perform its obligations under its oil and gas agreements, concluding

48. Finally, in this case in which Texaco's balance sheet shows a $2 billion net worth at book value, there does not appear to be any benefit from *rejecting or otherwise not performing under its Oil and Gas Agreements.* (emphasis supplied)

Two subsequent disclosures in this Chapter 11 case to Texaco's contractual counter-parties, other parties in interest and the Court are of relevance on this Motion. Under Texaco's Plan all its creditors (except Pennzoil) and all its equity interests were to be unimpaired. Moreover, as to Texaco's contracting parties Texaco's Second Amended Disclosure Statement dated January 29, 1988 contained the following disclosure at page 33:

4. ***Executory Contracts and Unexpired Leases.***

The Bankruptcy Code gives the Debtors the power, subject to the approval of the Bankruptcy Court, to assume or reject their respective executory contracts and unexpired leases. If an executory contract or unexpired lease is rejected by a Debtor, it will be treated as if the Debtor breached the contract or lease on the date immediately preceding the Filing Date and the other party to the agreement may file an unsecured Claim (Class 6) for damages incurred as a result of the rejection. In the case of rejection of employment agreements and leases of real property, such unsecured Claims are subject to certain limitations imposed by the Bankruptcy Code.

*The Plan provides that any executory contract or unexpired lease that is not rejected* by motion filed by the Debtors with the Bankruptcy Court prior to the Confirmation Date, or that is not, at such date, the subject of a pending application to reject, *will be deemed to have been assumed* on the Effective Date. The appropriate Debtor will be required to cure, or provide adequate assurance that it will promptly cure, any defaults under the executory contracts and unexpired leases that are deemed assumed on the Effective Date. (emphasis supplied)

Texaco's Plan dated January 27, 1988 contained the following provisions at page A–13:

## VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A. Subject to the requirements of Bankruptcy Code § 365, *all executory contracts or unexpired leases* of the Debtors that have not been rejected by order of the Bankruptcy Court or are not the subject of a motion to reject pending on the Confirmation Date *shall be deemed assumed* by the Debtor that is a party to such contract or lease on the Effective Date....

B. All proofs of Claim with respect to Claims arising from the rejection of executory contracts or unexpired leases must be filed with the Bankruptcy Court within thirty (30) days from and after the date of entry of an order of the Bankruptcy Court approving such rejection or such Claims shall be barred.

Thus, in the absence of any clear notice to the contrary, a party contracting with Texaco, such as an oil and gas lessor in the position of the Levee Districts, assessing its position in the Texaco Chapter 11 case and what steps it needed to take to protect its present and future rights as a lessor, was led to believe that its lease would be assumed, that Texaco intended to continue to operate in the normal course of business, that Texaco did not perceive "any benefit from rejecting *or otherwise not performing under its Oil and Gas Agreements*" and that its rights as a contracting party doing business with Texaco would be unimpaired as were all Texaco's creditors and equity interests.

### Texaco's "reserv[ation of] its right to contend" in paragraph 41

Although its ostensible objective in the Global Motion was the Exhibit E Order for "*assumption* by Texaco of *all* its Oil and Gas Agreements," Texaco included in the Global Motion a reservation of rights which ultimately led to an order *not* to assume half of its oil and gas leases. That reservation is contained in paragraph 41 of the Global Motion, which reads as follows in its entirety:

41. The reported decisions in bankruptcy cases support the proposition that oil and gas leases in certain states are subject to assumption. *See, e.g., In re J.H. Land & Cattle Co.,* 8 B.R. 237, 7 BCD 228 (Bankr.W.D.Okla.1981); *In re Gasoil, Inc.,* 59 B.R. 804 (Bankr. N.D.Ohio 1986). But, the issue is debated. *See In re Heston Oil Co.,* 69 B.R. 34 (N.D.Okla.1986) and *In re Clark Resources, Inc.,* 68 B.R. 358 (Bankr. N.D.Okla.1986) and *see generally,* Rochelle, *Some Bankruptcy Problems in Oil and Gas Cases* (1987) (published in Southern Methodist University School of Law Advanced Course in Bankruptcy Law). In some states, state law provides that oil and gas leases are not leases at all, but rather, are a conveyance of a fee estate subject to *defeasance* upon the occurrence of certain conditions subsequent. Texaco reserves its right to contend that certain of its leases are conveyances not subject to assumption; and by this application Texaco seeks authority to assume leases only to the extent they are subject to assumption pursuant to section 365 of the Bankruptcy Code. (11 U.S.C. § 365)

This enigmatic paragraph is one of three cornerstones underlying Texaco's Motion to bar the Levee District Claims.

### The July 10 Order

In fact, Texaco never did seek an Exhibit E Order for assumption of all of its oil and gas agreements. The metamorphosis from the Exhibit E Order to an order declaring that half of Texaco's oil and gas leases were not subject to Section 365 began with a notice of "clarification" dated June 24, 1987.

The June 24 Notice stated that the hearing on the Global Motion would be adjourned to July 2 and that "the relief requested in the [Global Motion] is hereby clarified to conform to the proposed order attached hereto" (the "June 24 Clarification Order"), which simply provided for

procedures. Nevertheless, the June 24 Clarification Order still on its face purported to seek an order or orders for Texaco to assume its oil and gas leases and other agreements. Thus, the heading began "ORDER (i) PROVIDING PROCEDURE FOR TEXACO INC. TO ASSUME ITS OIL AND GAS LEASES, MINERAL SERVITUDES [etc.]. . . ." The June 24 Clarification Order contained a full-page recitation that Texaco had "requested . . . an order (i) authorizing and providing for a procedure for the assumption by Texaco of its oil and gas leases, mineral servitudes [etc.]." Annexed to the June 24 Clarification Order as Exhibit I was a "NOTICE OF PROCEDURE TO ASSUME AND TO OBJECT TO OR MOVE IN RESPECT OF OIL AND GAS LEASES, MINERAL SERVITUDES [ETC.]. . . ." This Notice required Texaco to serve a copy of the June 24 Clarification Order "and written notice of its *assumptions of all* its Oil and Gas Agreements on each party to each agreement . . .," to specify the oil and gas agreements "to be assumed" and to specify whether Texaco believed a default existed and the monetary amount, if any, Texaco believed necessary to cure the default and "satisfy the requirements of Bankruptcy Code section 365(b)(1)." The Notice went on to set forth the method and deadline for "objections to or motions in respect of the assumption by Texaco of the Oil and Gas Agreements" and concluded that if no objection were timely filed

> the Bankruptcy Court without further notice *shall issue an order approving the assumption* . . . of each such Oil and Gas Agreement. (emphasis supplied)

The June 24 Clarification Order contained a series of decretal paragraphs of relevance here. If no objection or motion were timely filed by a party to an oil and gas agreement "the Court *will approve the assumption* by Texaco of the Oil and Gas Agreement without further notice . . ." (emphasis supplied). The Order was without prejudice to the rights of parties to each oil and gas agreement to object to or

move in respect of "its assumption on any ground including, without limitation, assumability of the agreement" and without prejudice to the rights of Texaco to respond to any such objection or motion on any ground. If any party to an oil and gas agreement asserted that the amount necessary to cure under Section 365(b)(1) was greater than the amount asserted by Texaco and the Court sustained such assertion, "then Texaco may withdraw its request to assume the agreement or may reject the agreement and the rejection shall constitute a breach of the agreement" pursuant to Section 365(g)(1). Under the June 24 Clarification Order it was expressly

> ORDERED that Texaco *shall* by no later than December 31, 1987 undertake to *assume all* its assumable Oil and Gas Agreements pursuant to the procedure annexed hereto as exhibit I *and shall only withdraw its requests to assume agreements,* or request to reject agreements *for which the Court holds that the amount necessary to satisfy Texaco's obligations* under Bankruptcy Code section 365(b)(1) *is greater than the amount asserted by Texaco* . . . . (emphasis supplied)

Only in the last decretal paragraph of the June 24 Clarification Order was there a suggestion that Texaco might not seek to assume all its oil and gas agreements despite the mandatory language of the paragraph just quoted. The last paragraph stated that the Order "is without prejudice to the contentions of Texaco or any party to an oil and gas agreement that any or all of its oil and gas leases, mineral servitudes or subleases do not constitute unexpired leases or executory contracts for purposes of Bankruptcy Code section 365."

On July 10, 1987 this Court entered an order (the "July 10 Order") which was an amalgam substantially (but not entirely) in the form of the June 24 Clarification Order and the Notice attached thereto as Exhibit I. Once again, the heading of the July 10 Order stated "ORDER (i) PROVIDING

PROCEDURE FOR TEXACO INC. TO ASSUME ITS OIL AND GAS LEASES, MINERAL SERVITUDES [etc.] ..." and set forth a lengthy recitation of the Global Motion as "having requested ... an order (i) authorizing and providing a procedure for the *assumption* by Texaco of its oil and gas leases, mineral servitudes [etc.]...." The July 10 Order set forth ten pages of decretal paragraphs and subparagraphs. The following are salient provisions:

### ORDERED, ADJUDGED AND DECREED, that

A. *Procedure under Bankruptcy Code Section 365.*

1. *Notice.* Texaco shall:

(a) File with the Court and serve by first class mail a copy of this order and notice of its proposed *assumption* of *all* its Oil and Gas Agreements on each party to each agreement *and on each statutory committee* .... (emphasis supplied)

(b) Identify in the written notices the Oil and Gas Agreements to be assumed and which Oil and Gas Agreements Texaco contends are not subject to assumption under Bankruptcy Code section 365;

(c) Specify in the written notices whether Texaco believes defaults exist under the Oil and Gas Agreement to be assumed for purposes of Bankruptcy Code section 365(b)(1);

(d) Specify the monetary amount, if any, and other remedy, if any, that Texaco believes is necessary to cure the defaults and satisfy the requirements of Bankruptcy Code section 365(b)(1) with respect of [sic] the Oil and Gas Agreements to be assumed; and

(e) Represent that assumption of the relevant Oil and Gas Agreement is beneficial to Texaco and in the best interests of the Texaco estate.

In paragraph 1(b) the alert reader will find that there may be notice of oil and gas agreements that "Texaco contends are not subject to assumption" under Section 365.

However, the prior version of this same paragraph in the June 24 Clarification Order (Exhibit I thereto) omitted this language, stating simply:

b. Identify in the written notices the Oil and Gas Agreements to be assumed;

Paragraph 2(a) contained another reference to a possible assertion by Texaco that an agreement was not subject to Section 365:

2. (a) *Procedure for Objections.* On or before the thirtieth day after Texaco serves its written notice, any party to an Oil and Gas Agreement, other than Texaco, may file with the Bankruptcy Court ... and serve on ... objections to, or motions in respect of, the assumption by Texaco of the Oil and Gas Agreement, or objections to Texaco's assertion that the agreement is or is not subject to Bankruptcy Code section 365....

However, the July 10 Order provided in paragraph 3(b):

(b) *No Objection.* If on or before the thirtieth day after Texaco gives *notice of its proposed assumption* of an Oil and Gas Agreement no statutory committee, other party in interest or party to the agreement has served and filed an objection, *the Bankruptcy Court,* without further notice, *shall issue an order granting the relief requested in Texaco's notice.* (emphasis supplied)

The July 10 Order was served on every counter-party to Texaco's 55,000 oil and gas agreements, together with a "NOTICE ENCLOSURE." Texaco sent to LBLD a three-page Notice Enclosure, the first page of which is reproduced as follows:

NOTICE ENCLOSURE PAGE 01 OF 03

BOARD OF COMMISSIONERS OF
THE LAFOURCHE BASIN
LEVEE DISTRICT
DONALDSONVILLE LA 70346

SERVICE DATE: JULY 27, 1987
OWNER NUMBER

000023793

TEXACO INC. OIL AND GAS LEASE(S) TO BE ASSUMED UNDER 11 U.S.C. SEC. 365*
CAN BE IDENTIFIED FROM THE INFORMATION APPEARING BELOW, WHICH DESIGNATES THE
PROPERTY NUMBER ASSIGNED TO THE DIVISION ORDER FOR THE LEASE TO WHICH YOU ARE A
PARTY OR SUCCESSOR IN INTEREST.

| STATE | COUNTY/ PARISH | PROPERTY NUMBER | PROPERTY/ LEASE NAME | MONETARY AMOUNT NECESSARY TO CURE DEFAULTS(S) AND ASSUME LEASE ** |
|---|---|---|---|---|
| LA | ST. CHARLE | 010101130001 | PAR PI RA-8 10; CCSE | $ -0- |
| LA | ST. CHARLE | 010101360137 | PAR PI RA-8 SU AJMCDONALD | $ -0- |
| LA | ST. CHARLE | 010102010605 | LLSE PARAO13 | $ -0- |
| LA | ST. CHARLE | 010102010628 | PAR 9500 NAG RA SU; LLSE | $ -0- |
| LA | ST. CHARLE | 010102010631 | PAR 11500 RC SU; LLSE | $ -0- |
| LA | ST. CHARLE | 010102010632 | PAR 11800 NAG RA SU; LLSE | $ -0- |
| LA | ST. CHARLE | 010102010631 | PAR 1000 NAG RA SU; MCDON | $ -0- |
| LA | LAFOURCHE | 015300010005 | VU B BDC UB OIL | $ -0- |
| LA | LAFOURCHE | 015300010027 | BDC 7550 RC SU, UT B | $ -0- |
| LA | LAFOURCHE | 015300010033 | BDC 7700 RC SU, UNIT B | $ -0- |
| LA | LAFOURCHE | 015360010102 | BDC 7500 R O SU, UNIT B | $ -0- |
| LA | LAFOURCHE | 015300010121 | 5500 RASUA BDC UB #121 | $ -0- |
| LA | LAFOURCHE | 015300010194 | BDC 7740 ROSU UB #BD | $ -0- |
| LA | LAFOURCHE | 015300010232 | BDC A-B RH SU; UB | $ -0- |
| LA | LAFOURCHE | 015300010244 | 6850 RG SUA; BDC UB W#122 | $ -0- |
| LA | LAFOURCHE | 015300010261 | BDC U B-25 RD-1 SU;BDC 4B | $ -0- |
| LA | LAFOURCHE | 015300010263 | BDC A RM-2 SU; BDC 4B | $ -0- |
| LA | LAFOURCHE | 015300010266 | VUB; BDC UB | $ -0- |

* TEXACO INC. BELIEVES THAT OIL AND GAS LEASES IN THE STATES OF LOUISIANA,
MISSISSIPPI, NEW MEXICO AND TEXAS ARE NOT SUBJECT TO 11 U.S.C. SEC. 365, AND
IS REQUESTING THE BANKRUPCY COURT TO MAKE SUCH A DETERMINATION. IF THE
COURT DETERMINES THAT ANY OF SUCH LEASES ARE SUBJECT TO 11 U.S.C. SEC 365,
THEN TEXACO INC. IS REQUESTING BANKRUPTCY COURT APPROVAL OF ITS ASSUMPTION
OF SUCH LEASES.

** IN INSTANCES WHERE A PARTY TO AN OIL AND GAS LEASE HAS ELECTED TO RECEIVE
ROYALTIES ON AN ANNUAL BASIS, OR WHERE THE ROYALTY ACCOUNT HAS NOT
ACCUMULATED $25.00, TEXACO INC. BELIEVES THESE LEASES ARE NOT IN DEFAULT
SINCE PAYMENTS ARE BEING MADE ON A NORMAL SCHEDULE.

N02

The second and third sheet listed 56 additional LBLD oil and gas leases with Texaco. The Notice Enclosure sent to WJLD with the July 10 Order was identical to the LBLD Notice Enclosure, except that the list of oil and gas leases comprised only two pages.

The second cornerstone of Texaco's Motion must be the footnote at the bottom of each Notice Enclosure referencing an " * " at the end of the first line of text at the top of the document. The first line of text reads "TEXACO INC. OIL AND GAS LEASE(S) TO BE ASSUMED UNDER 11 U.S.C. § 365*." In context, the footnote is a paradigm of ambiguity. Although the Notice Enclosure on its face purports to be a list of oil and gas leases "to be assumed" under 11 U.S.C. § 365, the footnote states that Texaco "believes that oil and gas leases" in Louisiana and other states "are not subject to 11 U.S.C. § 365, and is requesting the Bankruptcy Court to make such a determination", although the last sentence of the footnote

concludes that if the Court determines that the leases are subject to Section 365 Texaco "is requesting Bankruptcy Court approval of its assumption of such leases." This footnote (the "Footnote" or "Notice Enclosure Footnote") constituted the *only* notice sent to the Levee Districts that Texaco's Global Motion to assume was being used as a vehicle *not* to assume their Leases.

### The October 7 Order

The metamorphosis of the relief sought by Texaco in the Global Motion from an order assuming all oil and gas agreements to an order declaring that half of Texaco's oil and gas leases were not assumable under Section 365 was completed with an order signed by the Bankruptcy Court on October 7, 1987 (the "October 7 Order").

Its heading identified the October 7 Order as "ORDER PROVIDING THAT CERTAIN OIL AND GAS AGREEMENTS OF TEXACO INC. ARE NOT SUBJECT TO BANKRUPTCY CODE SECTION 365," and the single decretal paragraph stated simply that "the Oil and Gas Agreements are not subject to Bankruptcy Code section 365." As used in the October 7 Order, "Oil and Gas Agreements" was a defined term referring to the agreements which were listed in Exhibit A annexed to the Order. The list comprising Exhibit A was 1,146 pages long and, at 35 or more names to the page, listed over 40,000 counter-parties to over 25,000 Texaco oil and gas leases, including the Levee Districts. Three virtually identical orders were entered later listing a few hundred more leases. In all, 25,500 oil and gas leases were thus declared not subject to Section 365.

■ The October 7 Order is the third and final cornerstone underlying Texaco's Motion to bar the Levee District Claims. There is no dispute that, if it had assumed the Leases under the Global Motion, Texaco would be obligated to perform all its post-confirmation obligations under the Leases as they arose after confirmation, and there would be no basis for the present Motion. The law is clear that a debtor who assumes a lease or other executory contract assumes the contract *cum onere*, without any diminution in its obligations or impairment of the rights of the lessor in the present or the future.[1] Texaco acknowledges that its assumption of the Levee District Leases would have bound it to comply with the alleged obligations asserted in the State Court Action (subject, of course, to its right to contest those obligations under state law in the State Court Action), and that the Claims would not have been discharged if not for the purported effect of the October 7 Order.[2]

The October 7 Order *was never served* upon the Levee Districts or other lessor counter-parties, either before or after it was signed.[3] Thus, none of these lessors

---

**1.** *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 531, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) (should the debtor-in-possession elect to assume the executory contract, it assumes the contract *cum onere*); *In re National Gypsum Co.*, 208 F.3d 498 (5th Cir.2000), *cert. denied NGC Settlement Trust v. Century Indem. Co.*, —— U.S. ——, 121 S.Ct. 172, —— L.Ed.2d ——, 69 USLW 3022 (2000) (where the debtor assumes an executory contract, it must assume the entire contract, *cum onere*, accepting both the obligations and the benefits); *In re Kopel*, 232 B.R. 57, 63–64 (Bankr.E.D.N.Y. 1999) (It is axiomatic that an executory contract generally must be assumed *cum onere*. A debtor cannot simply retain the favorable and excise the burdensome provisions of an agreement); *In re Jamesway Corp.*, 201 B.R. 73, 76 (Bankr.S.D.N.Y.1996) (except as otherwise provided in the Bankruptcy Code, an executory contract or unexpired lease is assumed *cum onere*); *In re Cajun Elec. Power Co-op., Inc.*, 230 B.R. 693, 710 (Bankr. M.D.La.1999); 3 L. King. COLLIER ON BANKRUPTCY ¶ 365,03[1] at 365–22 (15th Ed.1998).

**2.** For example, at page 3 of a May 19, 2000 submission to this Court, Texaco stated: "If not for the[October 7 Order], the contractual claims [asserted by the Levee Districts in the State Court Action] would have been assumed and not discharged." *See also* August 24, 1999 Transcript at 50–51.

**3.** Upon inquiry by the Court, Texaco could find no affidavit of service or other evidence of service of the October 7 Order.

was ever notified whether its lease was assumed or declared not subject to Section 365.

The October 7 Order was presented to the Bankruptcy Court *ex parte*, without illumination or support, and without opposition. The October 7 Order contains a recitation which was, at best, highly misleading. The recitation states:

> ... Texaco Inc. ... having requested by notices and motions served between July 24, 1987 and August 28, 1987 (the "Motions"), an order holding that the agreements identified in the annexed exhibit A (the "Oil and Gas Agreements"), are not subject to Bankruptcy Code section 365, and no statutory committee, other party in interest or party to any of the Oil and Gas Agreements, in accordance with paragraph 3(b) of the July 10 Order, having served and filed an objection to the Motions on or before the thirtieth day after Texaco gave notice of the Motions, and after due deliberation, and sufficient cause appearing therefor, it is . . . .

The "notices and motions" served between July 24 and August 28 can only refer to the July 10 Order and Notice Enclosure, which was not a motion. The only motion served by Texaco as a predicate for the October 7 Order was the Global Motion dated June 9, 1987, which is not mentioned in the recitation. The representation that Texaco "requested by notices and motions ... an order holding that the agreements identified in the annexed exhibit A ... are not subject to Bankruptcy Code section 365" was contrary to fact. The Global Motion and the Exhibit E Order purported to request *assumption* of all oil and gas agreements, as did the June 24 Clarification Order and the July 10 Order. The record reveals no "motion," no application, no request to the Court for an order declaring that oil and gas leases were not subject to assumption under Section 365. The October 7 Order was simply presented to the Court, *ex parte*, with an incorrect recitation.

One further anomaly bears observation at this point. The October 7 Order recited that there was no objection "in accordance with paragraph 3(b) of the July 10 Order." Paragraph 3(b) of the July 10 Order, quoted above, disclosed the consequence of failure to object to the Global Motion. It stated that if no party objected within thirty days after *"notice of* [Texaco's] *proposed assumption* of an oil and gas agreement ... the Bankruptcy Court, without further notice, *shall* issue an order granting *the relief requested in Texaco's notice"* (emphasis supplied). The reader of this sentence would necessarily infer that the "relief requested" in the order which the Bankruptcy Court "shall issue" would be assumption, since the only "relief" referred to in paragraph 3(b) (and in the notices for the June 9 Global Motion, the June 24 Clarification Order and the July 10 Order) was assumption. It bears repeating that the only notification of a request for the relief provided in the October 7 Order was that contained in the Footnote in the July 10 Notice Enclosure.

Moreover, paragraph 3(b) of the July 10 Order itself represented a subtle modification of the version of that paragraph called for in the June 24 Clarification Order and its Exhibit 1. The first decretal paragraph of the Clarification Order Notice stated that if no objection were timely filed, "the Court *will approve the assumption* by Texaco of the Oil and Gas Agreement without further notice ..." (emphasis supplied). Paragraph 2 of Exhibit I stated that if timely objection were not filed, "the Bankruptcy Court, without further notice, *shall* issue an order *approving the assumption* ..." (emphasis supplied).

In short, the Levee Districts were told unequivocally in three different places in two separate notices that if they did not object to the Global Motion, their leases would be assumed.

### The Louisiana Land case

There were 32 objections to the Global Motion based upon disputes over cure

amounts, pre-petition defaults and the like. There were no objections based upon paragraph 41 or the Footnote in the Notice Enclosure. Two of the objectants were the State of Louisiana ("Louisiana") and the LaFourche Parish School Board (the "School Board"), both of which were lessors under oil and gas leases in which Texaco was lessee.

Unlike the thousands of Texaco oil and gas lease counter-parties who had no objection to their leases passing unaffected through the Chapter 11 case, Louisiana and the School Board were in a dispute with Texaco and were seeking to terminate Texaco's rights under their leases numbering over 100. By motions in this Court dated September 15 and 17, 1987, Texaco sought specific orders declaring its right to assume Louisiana's and the School Board's oil and gas leases under Section 365 or, alternatively, determining that those leases were not executory contracts or unexpired leases within the scope of Section 365. Louisiana and the School Board responded by arguing that their leases with Texaco were subject to Section 365 but were not assumable by reason of Section 365(c)(1).[4] In a decision dated August 22, 1988, this Court transferred venue of the controversy to the federal courts in the Middle District of Louisiana. The September 15 and 17 motions were ultimately resolved by the Louisiana District Court (Hon. John V. Parker, Chief Judge) in *Texaco Inc., et al. v. Louisiana Land and Exploration Co., et al.*, 136 B.R. 658 (M.D.La.1992) (the *"Louisiana Land* case").[5]

It is unnecessary for purposes of this decision to summarize the positions and arguments of the parties in the *Louisiana Land* case. Suffice it here to state that two issues were litigated and decided by Chief Judge Parker in *Louisiana Land:* (1) Were the Louisiana oil and gas leases there at issue "executory contracts" within the meaning of Section 365 of the Bankruptcy Code and, if so, (2) were the leases assumable under Section 365(c)(1)? Chief Judge Parker answered both questions in the affirmative. As to the first question, the District Court concluded "that the Louisiana mineral lease is an 'executory contract' within the meaning of Section 365(a)" (136 B.R. at 668). As to the second question, the District Court held "that there is nothing in Section 365(c)(1) which prevents Texaco, as debtor in possession, from assuming all State mineral leases in which it has interests" (136 B.R. at 671).

The *Louisiana Land* decision represents a considered and well-reasoned ruling after several years of litigation by the Louisiana District Court of a controversy which originated in Texaco's bankruptcy in this Court. The holdings of the District Court in *Louisiana Land* stand in direct contradiction of the *ex parte* and unopposed October 7 Order.

The significance of the *Louisiana Land* decision for this Motion will be discussed further below.

### The Levee District Leases and State Court Claims

The four Levee District Leases were granted to Texaco's predecessors in interest (Bagby Petroleum Corporation, Louisiana Land and Exploration Company and The Texas Company) in 1936, 1939 and 1945 and covered thousands of acres in the Paradis, Bay de Chene and the Queen Bess Island oil and gas fields, all within

---

4. Although denominated in the motion papers as a motion to assume with alternate relief, in fact Texaco's predominant position on the motions was that the leases were not executory contracts or unexpired leases within the scope of Section 365; the alternative relief sought by Texaco if this position were not sustained was an order declaring its right to assume leases notwithstanding the lessors' objections to assumption under Section 365(c)(1).

5. It appears from Chief Judge Parker's decision that Louisiana Land and Exploration Co., the original lessee on one of the Levee District Leases, had settled its part of the controversy by the time of the decision. 136 B.R. at 661.

the State of Louisiana. In 1994 Texaco assigned its interests in three of the Leases to TEPI.[6] Under the Leases Texaco was granted the right to drill wells, lay pipelines and construct any other structures reasonably necessary to conduct oil and gas exploration and production. The property owned by the Levee Districts in the Bay de Chene and Queen Bess Island fields consists of saltwater marsh and saltwater marsh islands, and the property owned by LBLD within the Paradis field is located within a fresh water swamp. The Leases are silent with respect to the issues of surface restoration and condition of return of the property to the Lessors. The Leases have neither expired nor terminated. Over the years Texaco has produced many millions of dollars of petroleum products under the Levee District Leases and has paid the Levee Districts millions of dollars in oil royalties. The Levee Districts have sued Texaco on several occasion for alleged underpayment of royalties on a variety of legal theories, and have settled with Texaco on some of those claims.

The parties have stipulated that the Levee District Claims arise predominantly from Texaco's construction and use of certain storage pits and dredged canals located within the leased properties.

*Closed pits.* There are three closed pits in the Bay de Chene field which were constructed by Texaco prior to 1958 and closed in December 1985. The three closed pits received saltwater produced from the wells in the vicinity and acted as a separating device which allowed oil and other substances entrapped in the produced water to separate prior to the produced water being discharged into the surrounding water bodies. Such use of earthen pits and discharge into open bays was customary in the oil and gas industry at the time. Texaco tested the contents of the closed pits before and after it closed the pits and knew of the results of the pre-closure and post-closure testing prior to filing its petition in bankruptcy.

*Open pits.* There are four open pits within the Bay de Chene field, one of which was constructed prior to 1978 and three of which were constructed prior to 1958. The most recently constructed open pit was used as a flare pit for a compressor. The specific use of the other three open pits is unknown, but the contents of the pits are consistent with use as reserve pits (used during the drilling of a well for temporary storage of materials such as drill cuttings and drilling muds).

*Canals.* Since the Bay de Chene and Queen Bess Island fields are located in coastal marsh areas, Texaco dredged a number of canals to gain access to well locations in these fields. Texaco obtained permits from the U.S. War Department/Corps of Engineers which are public records at the Corps of Engineers New Orleans office. The parties have stipulated to 363 such permits obtained by Texaco from August 1941 through August 1987. The canals dredged by Texaco which traverse the Levee District properties are still in existence today and Texaco continues to use some of the canals to gain access to facilities located on the leased property. The Levee Districts claim that certain areas of the marsh in the Bay de Chene field have been damaged due to altered hydrology allegedly caused by the presence of Texaco's canals and spoil banks associated with the canals.

The open and closed pits and the canals are open and obvious features of the landscape clearly visible on the ground and from the air. Until the State Court Action or shortly prior thereto the Levee Districts did not object to Texaco's construction and use of any of the pits or the canals and claimed no breach or damages with respect thereto. In its Notice Enclosures

**6.** For convenience, unless otherwise noted references to "Texaco" are intended to refer to TEPI where appropriate in context.

served on the Levee Districts with the July 10 Order Texaco listed "0" as the cure amount in respect of each of the Levee District Leases, and Texaco's position in the State Court Action is that its construction and use of the pits and canals was and is an integral and necessary part of its operation of the Leases for its own and the Levee Districts' mutual benefit and not a breach of its contractual and statutory obligations as lessee.

■ As summarized in paragraphs 117 and 118 of the parties' Stipulations of Uncontested Facts, the Levee Districts claim that Texaco's exploration and production activities have caused damage to their property. The Levee Districts claim that Texaco's operations and inactions (failing to restore the property at the earliest time) constitute a present and continuing violation of the Leases. The Levee Districts claim that Texaco's operations and its failure to remove pits, flow lines and other facilities and backfill canals constitute a violation of Texaco's obligation of prudent lease administration. None of the Levee District Leases contains express provisions for land restoration or remediation either during or at termination of the Lease. The "obligation of prudent administration" is deemed an implied contractual duty primarily based on the provisions of Louisiana Mineral Code Article 122 and the case law and other authorities interpreting this and other statutory provisions. Article 122 provides:

A mineral lessee is not under a fiduciary obligation to his lessor, but he is bound to perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself and his lessor. Parties may stipulate what shall constitute reasonably prudent conduct on the part of the lessee.

■ Part of or related to the mineral lessee's duty to act as a "reasonably prudent operator" are the lessee's obligations to restore the leased property, although this duty may not arise until at or near termination of the lease, since the lessee must necessarily construct facilities, disturb the land and cause some degree of environmental harm in order to exploit the lease and produce crude oil for his and the lessor's mutual benefit. The duty of restoration is derived from other statutory provisions, including Article 22 of the Louisiana Mineral Code and Articles 2719 and 2720 of the Louisiana Civil Code. The duty of restoration is referred to in the official Comment to Article 122 of the Mineral Code as follows:

Restoration of surface: The cases treating the obligation of a mineral lessee to restore the surface of the lease premises as near as is practical to original condition do not specifically include this obligation under the general obligation to act as a prudent administrator. Rather, this obligation has a foundation in Articles 2719 and 2720 of the Civil Code. However, there appears no reason whatsoever to exclude this particular obligation as being a specification of the prudent administrator standard. It is established that the mineral lessee must restore the surface even though the lease contract is silent. Smith v. Schuster, 66 So.2d 430 (La.App. 2d Cir.1953).

The parallel provision of Louisiana Mineral Code Article 22 governing mineral servitudes (as opposed to mineral leases, a distinction which the parties have not called to the Court's attention as being determinative), provides that the owner of a mineral servitude "is obligated, insofar as practicable, to restore the surface to its original condition at the earliest reasonable time." Article 2719 of the Louisiana Civil Code provides that "[i]f an inventory has been made of the premises in which the situation, at the time of the lease, has been stated, it shall be the duty of the lessee to deliver back everything in the same state in which it was when taken possession of by him, making, however, the necessary allowance for wear and tear and for unavoidable accidents." Article 2720 of

the Civil Code provides that "[i]f no inventory has been made, the lessee is presumed to have received the thing in good order, and he must return it in the same state, with exceptions contained in the preceding article."

■ The controversy in the State Court Action relates to the existence, scope and timing of the defendants' contractual and statutory "prudent operator" obligations with respect to clean-up, remediation and restoration. Timing is an important issue in the context of claim analysis under bankruptcy law. While it is clear that the duty to act as a prudent operator exists under Louisiana law, it is unclear when a breach of that duty occurs so as to give rise to "liability" on a "debt" and an enforceable "claim" within the meaning of Bankruptcy Code Section 101(5) and (12) for purposes of neat correlation with pre- or post-confirmation events. The Levee District Leases have been operated by Texaco or its predecessors for more than half a century. It is self-evident that oil and gas exploration, drilling and production by its very nature involves significant disturbance of and environmental damage to the lessor's property—simply put, it is a messy business. *See, e.g., Prather v. Chevron,* 563 F.Supp. 1366, 1367 (M.D.La. 1983) ("Drilling wells for oil and gas production requires that the surface of the land be disturbed to some degree. For this reason, the Louisiana Mineral Code requires that mineral owners exercise their rights to use the surface reasonably.... Digging pits by lessees is a common practice in drilling operations"). Part of Texaco's affirmative obligation as oil and gas lessee was to do what was necessary to exploit the leased property for the mutual benefit of itself and the Levee Districts, and to this end the Leases necessarily granted Texaco "the right to drill wells, lay pipelines, and construct any such other structures reasonably necessary to conduct oil and gas exploration and production on the leased premises" (Stipulation ¶ 11). "The law of this state is well settled that the main consideration of a mineral lease

is the development of the leased premises for minerals, and that the lessee must develop with reasonable diligence or give up the contract." *Carter v. Arkansas Louisiana Gas Co.,* 213 La. 1028, 36 So.2d 26, 28 (1948); *see also Caskey v. Kelly Oil Co.,* 737 So.2d 1257 (La.1999).

On the record before the Court there is no basis to conclude that Texaco committed a breach of contractual or statutory duty during the years and decades prior to March 23, 1988 when it constructed and used canals, storage pits for produced water or other purposes, drilling rigs, oil wells, flow lines and other paraphernalia necessary for the production of crude oil and gas. Indeed, to so conclude would be contrary to the record. Texaco stated its position in 1987 that there had been no breach resulting in a "debt" or a "claim" for bankruptcy purposes by representing "0" cure amounts in the July 1987 Notice Enclosures. And it appears that Texaco is arguing in the State Court Action that some or all of the Levee District Claims are premature because such restoration or remediation obligations as Texaco may have do not arise until at or near the termination of the Leases, even as to structures not presently in use such as the closed pits. *See, Edwards v. Jeems Bayou Production Co.,* 507 So.2d 11 (La.App. 2d Cir.1987) (mineral lessee who left cables in the ground and improperly filled pits was not required to restore portions of the drill site which would reasonably be needed for continued operation of a shut-in gas well). The Levee Districts apparently have not alleged a pre-petition breach, and the Levee District Claims are couched at least in part as anticipatory repudiation claims, as distinguished from claims of an actual breach of duty in the past.

### *Texaco's Position on this Motion*

Texaco argues on this Motion that the Levee District Claims in the State Court Action were discharged and barred by operation of the Bankruptcy Code and the Confirmation Order, reasoning as follows:

- Section 1141(d)(1)(A) of the Bankruptcy Code provides that confirmation of a plan "discharges the debtor from any debt that arose before the date of such confirmation";
- The Confirmation Order provided in paragraph 22 "each of the Debtors be, and it hereby is, discharged of and from any and all debts and Claims that arose against it before the date of entry of this order";
- Section 524(a)(2) of the Bankruptcy Code provides that a discharge "operates as an injunction against the commencement or continuation of an action ... to recover ... any such debt", and paragraph 25 of the Confirmation Order contained a similar injunction;
- Section 101(12) defines "debt" as "liability on a claim", and "claim" is defined broadly in Section 101(5) as "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured ...";
- The Levee District Claims fall within the definition of "debt" and "claim" in Section 101(12) and (5);
- Since the Levee District Claims were not filed in Texaco's Chapter 11 case prior to the date of confirmation, March 23, 1988, they were discharged and their prosecution is enjoined by the Confirmation Order and the Bankruptcy Code.

## DISCUSSION

### I. *Failure to assume leases did not result in discharge of Texaco's ongoing and future obligations as lessee-operator*

The fundamental defect in Texaco's Motion is the underlying premise that, merely

7. As noted in paragraph 46 of the Global Motion, "Texaco's oil and gas operations generate[d] annual cash flow of $1.5 billion" as

because the Levee District Leases and over 25,000 other Texaco oil and gas leases were not assumed as a consequence of the October 7 Order, Texaco would be relieved by its bankruptcy discharge from performing its ongoing and future contractual obligations under those leases even though it continued to operate and derive billions[7] of dollars of revenues under them.

Judge Schwartzberg, in *In re Yonkers Hamilton Sanitarium Inc.*, 22 B.R. 427 (Bankr.S.D.N.Y.1982), *aff'd* 34 B.R. 385 (S.D.N.Y.1983), noted that any party in a Chapter 11 case can apply to the court to assume or reject an executory contract under Section 365.

> It does not follow, however, that if neither party to an executory contract in a Chapter 11 case takes any action with respect to assumption or rejection, the contract has no significance. As long as the debtor continues to receive benefits under such contract it must also bear the burdens or obligations imposed under the contract.

22 B.R. at 435. The Bankruptcy Code does not require all contracts and leases to be either assumed or rejected. "The right to assume or reject an executory contract is optional although any party to the contract may request that the court order the trustee to assume or reject the contract within a specified period." *Aetna Casualty & Surety Co. v. Gamel*, 45 B.R. 345, 348 (N.D.N.Y.1984).

> Section 1123(b)(2) is permissive. The plan *may* provide for the assumption or assignment of an executory contract. On the other hand, the contract may 'ride through' the plan without being affected. However, a party to the contract may insist that it either be rejected or fully assumed under the plan if the contract has not already been dealt with separately from the plan.

of June 1987 when the Global Motion was filed.

7 L. King, COLLIER ON BANKRUPTCY ¶ 1123.02[2] at 1123–17 (15th Ed.1998) (emphasis in original). In *In re Cole*, 189 B.R. 40, 46 (Bankr.S.D.N.Y.1995), Judge (later Chief Judge) Brozman quoted and relied upon the foregoing language in *Collier*.

 Just as Section 1123 does not require a Chapter 11 plan to provide for assumption of executory contracts or unexpired leases, Section 365 contemplates that many contracts and leases will not be assumed by a debtor-lessee. And even though subsections (4) and (5) of Section 365(d) provide that certain unexpired leases shall be "deemed rejected" if not assumed or rejected within a time frame (as does subsection (1), which applies only in Chapter 7 cases), in actual practice it often happens that parties to contracts and leases (including leases "deemed rejected" under subsections (4) and (5)) simply continue to perform thereunder as though the bankruptcy had not happened. This has been addressed by the courts, which have uniformly held that when a debtor continues to derive benefits under the contract or lease, the debtor will also be burdened with the obligations, and the lease or other contract will be deemed to "pass through" or "ride through" the bankruptcy unaffected by it. As Judge Schwartzberg held in the *Yonkers Hamilton Sanitarium* case: "As long as the debtor continues to receive benefits under such contract it must also bear the burdens or obligations imposed under the contract." 22 B.R. at 435. *See also In re Chateaugay Corp.*, 10 F.3d 944, 955 (2d Cir.1993) (where a debtor fails to make an express election to reject or assume a contract or lease under Section 365, the debtor may incur priority expenses if the bankrupt estate derives benefits from the contract or lease); *In re Unishops, Inc.*, 553 F.2d 305, 308 (2d Cir. 1977) ("It is settled law that a claim arising under an executory contract is entitled to priority 'if the trustee or debtor in possession elects to assume the contract or if he receives benefits under it' ") (quoting *American Anthracite and Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*, 280 F.2d 119, 124 (2d Cir.1960)); *In re Cole*, 189 B.R. at 47 (although debtor did not assume two automobile leases, lessor would have an administrative claim for the use of the vehicles by the debtors in possession if the estate were benefitted by their use).

 When parties continue to perform under an unassumed contract or lease, the contract or lease passes through the bankruptcy unaffected. *In re Shoppers Paradise*, 8 B.R. 271 (Bankr.S.D.N.Y. 1980) (Schwartzberg, J.) ("Until assumed or rejected, an executory contract or unexpired lease remains in force and if neither assumed nor rejected, passes with other property of the debtor to the reorganized corporation"); *In the Matter of Greystone III Joint Venture*, 995 F.2d 1274, 1281 (5th Cir.1991) (if a debtor neither assumes nor rejects an executory contract, the contract continues in effect); *In re Cochise College Park, Inc.*, 703 F.2d 1339, 1352 (9th Cir. 1983) ("Until rejection, however, the executory contract continues in effect and the non-bankrupt party to the executory contract is not a creditor with a provable claim against the bankrupt estate"); *Boland v. Parmelee*, 1997 WL 642550 (N.D.N.Y.1997) ("The effect of neither accepting nor rejecting an executory contract is that the contract remains in force") (citing *Yonkers Hamilton Sanitarium* and *In re Shoppers Paradise, supra*); *In re Cajun Elec. Power Coop. Inc.*, 230 B.R. 715, 734 (Bkrtcy.M.D.La.1999) (executory contracts which are neither assumed nor rejected during a Chapter 11 proceeding flow through the proceeding "without alteration"); *In re Polysat, Inc.*, 152 B.R. 886, 891 (Bkrtcy.E.D.Pa.1993) (lease which was neither assumed nor rejected "passed through the chapter 11 case unaffected by bankruptcy"); *In re Nevada Emergency Services, Inc.*, 39 B.R. 859, 861 n. 1 (Bankr.D.Nev.1984) ("[C]ase law developed under past and current law supports the conclusion that such contracts pass through the reorganization proceedings

unaffected and become an obligation of the reorganized debtor"). *See also N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 546 n. 12, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) (Brennan, J., concurring and dissenting) ("In the unlikely event that the contract is neither accepted nor rejected, it will 'ride through' the bankruptcy proceeding and be binding on the debtor even after a discharge is granted. . . . The nondebtor party's claim will therefore survive the bankruptcy proceeding"). "A finding that an unassumed and unrejected executory contract passes through the bankruptcy proceeding and remains in effect is in keeping with Chapter 11's policy of allowing the trustee freedom to run the business without having to obtain court approval at every step." *In re DeVlieg, Inc.*, 1993 WL 248205 at *3 (N.D.Ill.1993).

■ In short, whether an executory contract or unexpired lease is assumed under Section 365 or not, and whether or not a particular contract or lease is technically assumable under Section 365, does not matter in the context of this controversy. In either event, if the debtor continues to operate under and derive all of the economic benefits of the contract or lease then the debtor retains all of its obligations and burdens and the contract or lease passes through the bankruptcy unaffected by it, just the same as if the contract or lease had been assumed under Section 365.

■ Texaco relies on the leading decision of the Court of Appeals for the Second Circuit in *United States v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997 (2d Cir.1991) ("*Chateaugay*"), this Court's decision in *Texaco Inc. v. Sanders (In re Texaco Inc.)*, 182 B.R. 937 (Bankr. S.D.N.Y.1995) ("*Sanders*") and other decisions in asserting that "a claim arises at the moment when acts giving rise to the

alleged liability are performed." Texaco argues that all of the physical acts on which the Levee District Claims are based (*e.g.*, construction and use of the pits and the canals) were completed pre-confirmation, that the Claims arose from a relationship (that of lessor-lessee) existing pre-confirmation and that the Claims (for clean-up, restoration, remediation, etc.) were all foreseeable and foreseen pre-confirmation. Since the Levee Districts did not file the Claims before the bar date in its Chapter 11 case, Texaco argues, the Claims are barred under the authority of *Chateaugay, Sanders* and like decisions.

It is true that the lessor-lessee relationship existed, and that future "prudent operator" claims were foreseeable, long before 1988. But it is not true that everything giving rise to the Levee District Claims had occurred by 1988—Texaco had not breached the Leases.

Claims for breach of contract occurring before confirmation may perhaps be discharged by confirmation of a Chapter 11 plan if not timely filed before the bar date.[8] This is the type of claim that would give rise to an obligation to "cure" under 11 U.S.C. § 365(b)(1)(A). The most typical example of a claim for breach of contract which would be barred by a Chapter 11 discharge is a pre-petition or pre-confirmation failure to pay royalties in accordance with an oil and gas lease. *See Texaco, Inc. v. Wolverine (In re Texaco, Inc.)*, 218 B.R. 1 (Bankr.S.D.N.Y.1998) ("*Wolverine*").

But the types of obligations sought to be enforced in the Levee District Claims do not arise from any obligation or breach of contract that "arose before" confirmation. This is evident from the conduct of both Texaco and the Levee Districts, and from the nature of the Claims themselves. Texaco conceded this when it represented "0"

---

**8.** *But see In re National Gypsum Company,* 208 F.3d 498, 509 (5th Cir.2000), *cert. denied NGC Settlement Trust v. Century Indem. Co.,* —— U.S. ——, 121 S.Ct. 172, —— L.Ed.2d ——, 69 USLW 3022 (2000) which held "that

§ 1141(d) cannot be read to provide for discharge of amounts in default under assumed contracts in a manner that would nullify the cure requirement of section 365(b)(1)."

as the "cure amount" in the July 10 Notice Enclosure, and the Levee Districts apparently have never contended that Texaco committed a pre-petition breach. If Texaco believed it had committed a breach of duty in 1987, it should have disclosed a "cure" obligation. Construction of the pits, canals, etc. before 1988 did not produce a "debt" or "claim" because construction of those facilities was authorized by the Leases, was necessary to find and produce oil and gas and did not constitute a breach of anything.[9] The obligation to clean up, restore, etc. and breach of those duties alleged in the Levee District Claims had not arisen by 1988 and may not have arisen by now.[10]

Texaco acknowledged in the Global Motion that it would in the future be required to incur some lease termination costs, mentioning specifically clean-up, remediation, restoration, plugging and abandonment. In the normal course Texaco, like any other oil and gas lessee, would comply with its "prudent operator" lease obligations as and when they arose in the ordinary course of business, generally by agreement with the lessor as contemplated by the last sentence of Article 122 of the Louisiana Mineral Code. In some cases, such as this one, the lessor and the lessee may not agree as to what the lessee must do to comply with its "prudent operator" obligations or when it must do it. Then the controversy will be resolved in arbitration or in the courts. But in the real world it is utterly unrealistic to say that a dispute arising in 1997 over the scope of a lessee's ongoing and future "prudent operator" obligations, which no one claims were

supposed to have been performed before 1988, involves "debts" or "claims" under Section 101(12) or 101(5) that "arose before" and were discharged by a 1988 Confirmation Order.[11]

It is not surprising that no court has ever held that future claims for possible future breaches of contract constitute "claims" under Section 101(5) that must be filed pre-confirmation. Neither *Sanders* nor *Chateaugay* nor any of the other decisions relied upon by Texaco involved discharge of a future contract claim. Indeed, this Court expressly declined to rule on contract claims in *Sanders*. 182 B.R. at 957–58. *See also,* this Court's analysis in *Wolverine,* 218 B.R. at 7–8, which held that post-confirmation pricing claims were not barred, even though based upon the same allegedly erroneous pricing formula that Texaco had established pre-confirmation.

■■■■ Simply stated, the basic rule is that claims arising after confirmation from a contractual relationship are not barred by a confirmation order. It is only where the liability asserted in a claim is based upon a breach of contract that occurred before confirmation that the claim must be filed in the bankruptcy. Potential claims for liabilities for breach of obligations which might occur after confirmation cannot be filed before confirmation even if they could be anticipated. Texaco necessarily acknowledges this rule when it concedes that the Levee District Claims would not have been discharged if the Levee District Leases had been assumed (foot-

---

9. By contrast, the alleged contamination from Texaco's pits in *Sanders* constituted a tortious breach of duty which gave rise to a claim as soon as the "plume" of contaminants invaded the plaintiffs' lands. The same may be said of the CERCLA claims in *Chateaugay,* where the debtor's liability for remediation costs arose immediately upon contamination.

10. The foregoing discussion renders unnecessary any consideration of Texaco's contentions based upon the Stipulation signed on or about October 13, 1995.

11. An oil and gas lessee's liability for "prudent operator" and "termination" obligations may be triggered or accelerated and may become pre-confirmation "debts" and "claims" if the lease is rejected or otherwise terminated before confirmation. But a declared objective of the Global Motion was to avoid such pre-petition claims by *not* rejecting or otherwise terminating oil and gas leases (*see, e.g.,* paragraph 39) and Texaco did not reject or terminate the Leases.

note 2, above; *see* cases cited in footnote 1). As stated in *Sanders,* "[w]ith respect to the Gary surface lease, Texaco acknowledges that this contract was assumed by Texaco and that claims under the contract are not discharged, and Texaco's proposed order submitted at the conclusion of the hearing on May 8 so provides." 182 B.R. at 958.

Nevertheless, without rationale and without authority Texaco's Motion is grounded on the premise that the basic rule does not apply, and that the Levee District Claims should be held to be discharged, simply because the Levee District Leases were never assumed. That premise finds no support in logic or the law. As held by Judge Schwartzberg in *Yonkers Hamilton Sanitarium* and *Shoppers Paradise,* and the uniform line of decisions cited and quoted above, the consequence of a debtor's continuing to reap the benefits of a contract it has neither assumed nor rejected is that the debtor must comply with all of the obligations and burdens of the contract, just as though it had been assumed under Section 365. There is no reason to distinguish between a contract that is technically assumed under Section 365 and a contract which the debtor without formal assumption continues to perform under and derive benefits from. In either event, the burdens follow the benefits, and the same basic rule applies—claims for breach of post-confirmation obligations arising from the contractual relationship are not discharged by the confirmation order.

▌ The foregoing is entirely consistent with the Bankruptcy Code and the case law. Section 1141(d)(1)(A) says confirmation "discharges the debtor from any *debt* that *arose before* the date of such confirmation." A "debt" under Section 101(12) is a *"liability* on a claim", and "claim" under Section 101(5) is a *"right to payment."* As in *Wolverine,* there is no "liability" or "right to payment" *before* confirmation as to royalties payable under an oil and gas lease a month or a year or a

decade *after* confirmation. The same applies to "prudent operator" obligations to clean up or restore that, under state law, do not arise until after confirmation. A legal obligation that does not arise under state law until the 1990s or beyond cannot be mystically converted into a "contingent" or "unmatured" "claim" as of March 23, 1988 because as of that date no "right to payment" of any kind exists, and there is no "liability" and no "debt" that "arose before" that date. As the Second Circuit said in *In re Chateaugay,* 53 F.3d 478, 497 (2d Cir.1995): "However broadly 'claim' is understood, it is clear that the existence of a valid bankruptcy claim depends on (1) whether the claimant possessed a right to payment, and (2) whether that right arose before the filing of the petition." *See also In re Manville Forest Products Corp.,* 209 F.3d 125, 129 (2d Cir.2000).

## II. *Equitable estoppel and Constitutional due process preclude the relief sought by Texaco*

Even if there were authority for discharge of claims arising post-confirmation but not filed pre-confirmation under contracts not assumed under Section 365, discharge would be precluded on the facts here under elementary principles of equitable estoppel and Constitutional due process.

▌ "Equitable estoppel is grounded on notions of fair dealing and good conscience and is designed to aid the law in the administration of justice where injustice would otherwise result." *Eastern Air Lines, Inc. v. Insurance Company of Pennsylvania (In re Ionosphere Clubs, Inc.),* 85 F.3d 992, 999 (2d Cir.1996) (citing *Readco, Inc. v. Marine Midland Bank,* 81 F.3d 295, 301 (2d Cir.1996) and *Marine Transportation Services Sea–Barge Group, Inc. v. Python High Performance Marine Corp.,* 16 F.3d 1133, 1138 (11th Cir.1994)).

Broadly speaking, the essential elements of an equitable estoppel, as related to

the party to be estopped, are (1) conduct which amounts to a false representation or concealment of material facts, (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons, and (3) knowledge, actual or constructive, of the real facts. With respect to the party to which representations have been made, the essential elements are (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance in good faith upon the conduct or statements of the party to be estopped, and (3) action or inaction based thereon of such a character as to change the position or status of the party claiming to estoppel [sic] to his detriment. (footnote omitted)

12 Am.Jur.2d, Bills and Notes § 554 (1997). *See also Sequa Corp. v. Christopher (Matter of Christopher),* 28 F.3d 512, 520 (5th Cir.1994); *Neiman–Marcus Group, Inc. v. Dworkin,* 919 F.2d 368, 371 n. 4 (5th Cir.1990); *In re Car–Gill, Inc.,* 125 B.R. 133, 137–38 (Bankr.E.D.Pa.1991).

▪ The close relationship between equitable estoppel and the due process requirement of full and fair disclosure in bankruptcy is perfectly articulated in the Second Circuit decision in *In re Momentum Mfg. Corp.,* 25 F.3d 1132, 1136 (2d Cir.1994), where the Court said:

Of prime importance in the reorganization process is the principle of disclosure. The Code obliges a Debtor to engage in full and fair disclosure, providing to creditors "information of a kind, and in sufficient detail, as far as is reasonably practicable ... that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan...." § 11 U.S.C. 1125(a)(1). This disclosure requirement does not attach only to the preparation of disclosure statements. "Full and fair" disclosure is required during the entire reorganization process;

it begins "on day one, with the filing of the Chapter 11 petition." *In re V. Savino Oil & Heating Co.,* 99 B.R. 518, 526 (Bankr.E.D.N.Y.1989).

▪ Although partially decided on the basis of Section 1125(a)(1), *Momentum's* reasoning is equally applicable here. Equitable estoppel applies where the disadvantaged party "(1) lacked knowledge of the true facts, (2) reasonably relied on the Debtor's misleading conduct, and (3) suffered prejudice as a result of their reliance." 25 F.3d at 1136.

▪ "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). "Fair or adequate notice has two basic elements: content and delivery. If the notice is unclear, the fact that it was received will not make it adequate." *Fogel v. Zell,* 221 F.3d 955, 962 (7th Cir.2000).

▪ Every motion paper filed by Texaco with the Court and served on the Levee Districts and other oil and gas counter-parties—the June 9 Global Motion, the June 24 Clarification Order and the July 10 Order—proclaimed in bold print and repeatedly in text Texaco's intent and request to assume all oil and gas agreements. The dominant theme of Texaco's Chapter 11 case, made explicit in the Global Motion, the Disclosure Statement and the Plan, was that Texaco's oil and gas operations were to continue in the ordinary course through and after Confirmation. The Disclosure Statement and the Plan provided that all contracts not rejected under Section 365 were deemed assumed and that all creditors (other than Pennzoil) and all equity holders were to be unimpaired in their rights. Even the Notice Enclosure proclaimed in the first line

at the top of the page "TEXACO INC. OIL AND GAS LEASE(S) TO BE ASSUMED UNDER 11 U.S.C. § 365." The June 24 Clarification Order notified the Levee Districts in two different places, and the July 10 Order gave notice in paragraph 3(b), that failure to file timely objection to the Global Motion would result in a Court order approving the assumption by Texaco of the oil and gas agreements without further notice.

Under the doctrine of equitable estoppel, this blizzard of declarations of Texaco's intent to assume and bald notices that absent objection the Bankruptcy Court "shall" issue an order for assumption must estop Texaco from claiming that hundreds of millions of dollars of potential post-confirmation "prudent operator" claims were discharged because the October 7 Order, instead of granting assumption, provided exactly the opposite.

To overcome this estoppel, Texaco must show that the Draconian consequence of discharge claimed to flow from the October 7 Order is not inequitable because the Levee Districts and other lessors had sufficient notice to enable them to protect their future rights under their leases. To do this, Texaco can rely only on paragraph 41 of the Global Motion and on the Footnote in the July 10 Notice Enclosure. By any standard, such notice was palpably insufficient under the Due Process Clause to deprive the Levee Districts and other oil and gas lessors of valuable property rights. Paragraph 41 did no more than cite certain decisions in support of, and contrary to, the proposition that oil and gas leases were subject to assumption, noting that "the issue is debated" and concluding by reserving Texaco's "right to contend that certain of its leases are conveyances not subject to assumption". As noted above, the July 10 Notice Enclosure contained the *only* notice to the Levee Districts that Texaco would contend that their Leases were not subject to assumption, and that notice was contained in the Footnote. Moreover, the Notice Enclo-

sures were ambiguous at best because the first line of each recited "TEXACO INC. OIL AND GAS LEASE(S) TO BE ASSUMED UNDER 11 U.S.C. § 365* ", and the Footnote concluded that if the Court determined that any of the Leases were subject to Section 365 "THEN TEXACO INC. IS REQUESTING BANKRUPTCY COURT APPROVAL OF ITS ASSUMPTION OF SUCH LEASES." The Footnote notice was insufficient for the further reason that the Levee Districts were never notified whether in fact the Bankruptcy Court had determined that the Leases were not subject to assumption under Section 365, because the October 7 Order was never served on them.

This ambiguous Footnote was patently insufficient to fairly apprise the Levee Districts that the relief which Texaco would seek from the Court as to their Leases was precisely the opposite of the relief ostensibly sought in the Global Motion, the June 24 Clarification Order, the July 10 Order and the very first line of the Notice Enclosure itself.

But the Constitutional defect was much deeper. Even if the Footnote could be deemed adequate notice that Texaco would request an order declaring the Leases not subject to assumption, and even if the Levee Districts had been served with a copy of the October 7 Order, nowhere did Texaco disclose the consequence now attributed to that Order—discharge of "prudent operator" obligations respecting clean-up, remediation and restoration which might arise in the years or decades following Texaco's bankruptcy. Texaco gave clear notice to counter-parties to contracts that were rejected that they were required to file claims for rejection damages by stated bar dates. By contrast, the Levee Districts were never given notice that, as a consequence of the October 7 Order, Texaco would later assert the unprecedented requirement that they had to file before confirmation claims for possible failure of Texaco to comply with "prudent operator" obligations in the years or dec-

ades following confirmation, or that such claims would be discharged if not filed pre-confirmation. Quite the contrary, Texaco represented in the Global Motion that it would continue to perform under all its oil and gas agreements in the normal course of business and that it would not benefit from "not performing under its Oil and Gas Agreements" (paragraph 48).

The legal consequences which Texaco's motion would attach to the October 7 Order are both novel and radical. For this Court now to enforce the October 7 Order in the manner sought by Texaco would be grossly inequitable and would deny the Levee Districts and other lessors their due process right in 1987 to protect their property either by contesting the Order with knowledge of its consequences or doing what Texaco now says had to be done to preserve the Claims.

### III. *The October 7 Order may not be given effect contrary to the expectations of the parties, the Court and the decision in Louisiana Land*

 Court orders, like statutes and contracts, must be construed and given effect in a manner that comports with the fair understanding and intent of the parties and the Court. The question is whether the consequence of the October 7 Order now advocated by Texaco was intended or contemplated by the parties or the Court in 1987. The indubitable answer is, it was not.

Nothing in the Global Motion or subsequent court papers suggested any such consequence. It cannot be supposed that Judge Schwartzberg contemplated that post-confirmation contract claims not filed pre-confirmation would be discharged for the 25,500 Texaco oil and gas leases affected by the October 7 Order, while no such effect burdened the other 25,500 leases which were assumed. This is particularly so in light of his decisions in *Yonkers Hamilton Sanitarium* and *Shoppers Paradise,* rendered in 1982 and 1980, respectively, in which he had held that contracts neither assumed nor rejected passed through the bankruptcy unaffected by it, just like assumed contracts. Nor can it be supposed that the Levee Districts or 25,500 other counter-parties had any notion that their rights as lessors in the years and decades after Confirmation might be affected by Texaco's discharge if their leases were not subject to Section 365. Not a single counter-party affected by the Global Motion filed an objection to it based upon the paragraph 41 reservation or the Notice Enclosure Footnote. Not a single lessor affected by the October 7 Order filed a claim in respect of a possible post-confirmation breach of Texaco's obligations as lessee, although a number of claims were filed by oil and gas lessors, including one of the Levee Districts, on account of alleged breach of contract claims arising pre-petition.[12]

By the same token, I reject any notion that Texaco obtained the October 7 Order in the manner documented above with the

---

12. In a telephonic conference on September 12, 2000, this Court asked Texaco to provide documentation as to whether any oil and gas lessors subject to the October 7 Order filed a proof of claim for remediation, restoration, or plugging and abandonment as a consequence of the October 7 Order. In response, Texaco produced three claims. The first claim alleges a refusal by Texaco in March 1987 to restore damage on the lessors' property. Thus, the first claim arose from a pre-petition breach by Texaco, and in the complaint, the lessors state that this breach, rather than the October 7 order, precipitated the claim to "protect their past and future interests." The second proof of claim, filed on February 18, 1988, cited an amount demanded in a Petition for Damages filed March 2, 1987, which alleged present liability of Texaco for restoration of surface and mineral damages to the lessor's property arising from Texaco's termination of drilling operations. As it arose from a Petition for Damages filed in March 1987, the second claim was not motivated by the October 7, 1987 order. The third claim, dated March 11, 1988, simply states an unliquidated claim for salt water and oil pollution, and what prompted the lessor to file it is unclear.

surreptitious intent of thereby obtaining from unwitting lessors a discharge of post-petition "prudent operator" obligations by not disclosing the consequences now advocated. Such a notion would be beyond cynical.[13] Rather, it appears entirely consistent with the record in this matter that neither Texaco nor its oil and gas lessors contemplated that the October 7 Order would mean that the lessors would have to file before Confirmation untold hundreds of millions of dollars of possible future claims for the costs of clean-up, remediation, restoration, plugging and abandonment which might arise years in the future on termination of the leases, or that failure to file such claims would result in their discharge. I take at face value and in good faith (as the Levee Districts and other lessors were entitled to do) Texaco's assurances in the Global Motion that Texaco did not wish to incur in its bankruptcy the sort of termination costs just mentioned which would result from rejection or termination of oil and gas leases, and its repeated representations that it would continue to operate its oil and gas agreements in the ordinary course of business and perceived no benefit in "rejecting or otherwise not performing under its Oil and Gas Agreements" (Global Motion ¶ 48). In this connection, it should be noted that the

entire universe of "cure" amounts asserted by Texaco to be due as a condition for assumption of its oil and gas agreements was $55 million, and that Texaco reserved the right not to assume such agreements if the cure amounts exceeded those determined by Texaco. In view of the foregoing, it cannot be supposed that Texaco itself contemplated that a consequence of the October 7 Order would be that half of its 51,000 oil and gas lessors would be required to file before Confirmation claims for incalculable millions of dollars of post-confirmation "prudent operator" and termination costs which Texaco expressly said it wanted to avoid and which would not arise in the ordinary course for years or decades.[14]

Finally, one must consider what impact, if any, the decision of the Louisiana District Court in *Louisiana Land* has on this Motion. The July 10 Notice Enclosure Footnote stated that Texaco "is requesting the Bankruptcy Court to make [ ] a determination" that "oil and gas leases in the states of Louisiana, Mississippi, New Mexico and Texas are not subject to 11 U.S.C. sec. 365." Understandably, no recipient of the Footnote filed any objection to the Global Motion. Thus, the October 7 Order did not constitute a "determination" in any

13. *But cf.*: As early as June 1987, Texaco was put on notice of its Constitutional due process obligations to parties affected by the Global Motion by at least two objectors. In objecting to the procedures proposed by the Global Motion. Plaquemines Parish Government ("PPG") referred to an April 17, 1987 application by Texaco for the assumption of mineral leases. PPG alleged that "the gross absence of adequate 'notice' thereof by Texaco, and Texaco's failure to transmit to all lessors, specifically PPG, copies of the Order rendered on April 23, 1987, demonstrate a pattern of conduct that bears the interpretation that Texaco intends to have as few mineral lessors as possible become aware of its efforts to assume mineral leases." The State of Louisiana and Louisiana Department of Natural Resources objected to the April 17 application because "Texaco did not notice the State of Louisiana of the April 17th motion, despite the fact that the State of Louisiana ... is lessor in connection with some 100 oil, gas and mineral leases

...". The State of Louisiana stated that "despite the fact that this Court's order of April 23, 1987 requires that a certified copy of said order be transmitted to each lessor receiving payments as authorized therein, to the knowledge of the State of Louisiana, no such transmittal has ever been made," and "[r]eview of the docket sheets ... indicates that no Certificate of Service certifying delivery of the order of April 23, 1987 ... has ever been provided to this Court."

14. If the average per-lease future "prudent operator" and termination costs (similar to those with an alleged value of $60 million in the Levee District Claims) on Texaco's 25,500 unassumed leases were estimated at the unrealistically conservative figure of only $500,-000, such claims if filed in Texaco's bankruptcy would have aggregated $12.75 billion, far more than the Pennzoil judgment that precipitated the bankruptcy.

meaningful sense because the Order was entered *ex parte* and unopposed.

But this Court *was* called upon to make such a "determination" in Texaco's September 15 and 17, 1987 motions directed to the Louisiana and School Board oil and gas leases. That determination, ultimately made by Chief Judge Parker in the *Louisiana Land* decision, was that Louisiana oil and gas leases are executory contracts subject to Section 365 and are assumable notwithstanding the provisions of Section 365(c)(1). It would be anomalous in the extreme to grant the Draconian relief now sought by Texaco based upon the October 7 Order in the face of the contrary and well-reasoned decision in *Louisiana Land*, which constituted the only actual "determination" of the issue ever made by a court in connection with Texaco's bankruptcy.

Texaco makes several arguments why the *Louisiana Land* decision is "inapposite." It asserts that "[i]n the Global Motion, Texaco sought an order determining that Louisiana oil and gas leases are not subject to Bankruptcy Code section 365" (May 19, 2000 Response of Texaco to Court's Request for Supplemental Submissions, at 2) and refers to "Judge Schwartzberg's finding that the Louisiana mineral leases were not subject to Bankruptcy Code section 365" (*id.* at 3). In fact, Texaco did *not* seek an order that Louisiana oil and gas leases were not assumable. As the documents show, the Global Motion, the June 24 Clarification Order and the July 10 Order all purported to seek Bankruptcy Court approval for the assumption of all Texaco's oil and gas agreements. The record is devoid of any motion, application or written request for an order that Louisiana oil and gas leases were not subject to Section 365. Nor did the October 7 Order constitute a "finding" by Judge Schwartzberg that Louisiana mineral leases were not subject to Section 365. The Order was presented *ex parte* and signed, but it did not constitute a "finding" or a "determination" because it was unopposed. Texaco asserts that "the Levee Districts

are bound by the [October 7 Order] which is final and over 12 years old" (*id.* at 3). Perhaps, but the decision in *Louisiana Land* constitutes the final and binding resolution of a controversy arising in this Court, and *it* is binding on Texaco. The contention by Texaco that "the court in *Louisiana Land* failed to apply the appropriate definition of executory contract and, thus, reached the wrong result" (*id.* at 5) may or may not be correct. But right or wrong, the *Louisiana Land* decision is nonetheless the "law of the case" so far as Texaco and this Court are concerned. Finally, Texaco asserts that "the leases at issue in *Louisiana Land* were different [principally because] [t]hey contained affirmative obligations not found in the Levee Districts' leases" (*id.* at 5). However, there were more than one hundred leases at issue in the *Louisiana Land* case, many of which were substantially the same in form and content as the Levee District Leases without the "affirmative obligations" referred to by Texaco, and the *Louisiana Land* decision applied to all of the leases there involved without discrimination based upon any differences among the leases.

This Court will not enforce the October 7 Order in a manner which was unimagined by the parties or the Court, and which would be contrary to the fully litigated, well-reasoned, final order and judgment of the Louisiana District Court to which this Court referred the very same issue for determination.

### Order Denying Texaco's Motion

Texaco's motion for summary judgment is denied and the Levee Districts' motion for summary judgment is granted. Counsel for the Levee Districts are directed to submit an order consistent with this Decision in a form agreed to by Texaco's counsel, without prejudice to Texaco's right of appeal.